Condon S. BUSH and wife Betsy R.
Bush, Plaintiffs-Appellees;
Cross-Appellants,

v.

Betty M. CATHEY, Defendant-Appellant;
Cross-Appellee.

Court of Appeals of Tennessee,
Eastern Section.

Nov. 27, 1979.

Certiorari Denied by Supreme Court
Feb. 25, 1980.

W. W. Davis, Jr., William P. Newkirk, Knoxville, for Condon S. Bush and wife.

Robert L. Crossley, Knoxville, for Betty M. Cathey.

## OPINION

GODDARD, Judge.

This is an action for specific performance of an alleged contract for the sale of the home of Betty M. Cathey, Defendant-Appellant, Cross-Appellee, brought by Condon S. Bush and wife Betsy R. Bush, Plaintiffs-Appellees, Cross-Appellants. Both parties appeal the judgment of the Chancery Court for Knox County which decreed specific performance of the contract and awarded the Plaintiffs $5000 in compensatory damages.

The Defendant assigns as error (1) that a contract, enforceable at law, did not exist between the Plaintiffs and the Defendant, (2) that Ed Johnson (a real estate broker) acted as agent for the Plaintiffs so as to charge them with his conduct, (3) that, if a contract did exist for the sale of the Defendant's home to the Plaintiffs, it was not so clear, definite and free from any suspicion of fraud or unfairness as to support the extraordinary remedy of specific performance, and (4) that if a contract did exist, the award of money damages was not justified in light of the proof. Plaintiffs assign as error (1) that the Chancellor may not base a finding of fact regarding the costs and expenses of maintaining a personal residence on personal knowledge absent any proof of such costs, (2) that a purchaser of real estate should be reimbursed for damages such as additional moving expenses caused by the vendor's delay in delivery of possession, and (3) that a purchaser of real estate should be compensated for the loss of the use of such property caused by the vendor's refusal to deliver possession pending the appeal of the Trial Court's grant of specific performance.

Betty M. Cathey is a widow, 54 years of age, whose husband, Gene Cathey, died of brain cancer in June 1973 after a six months' illness. They had been married for 25 years.

The late Mr. Cathey had operated two businesses in his lifetime, an appliance store in which Mrs. Cathey worked, and a house building business. Mr. Cathey built the house that is the subject of this litigation. It is an 18-room, 6000 square foot, two-level brick home adjacent to a golf course in Knoxville. The Catheys, their daughter Kay, and Mrs. Cathey's mother occupied that house as their home from the time it was built in 1961.

At the request of Mr. Cathey a Knoxville real estate broker named Dan Culp assisted Mrs. Cathey in obtaining a real estate broker's license and allowed her to use his office on a part-time basis. The result of Mrs. Cathey's work in the real estate business was that she sold "one and a half" houses, but it was during that period that she met Ed Johnson, a broker, who at the time was working for Culp.

In February 1978, Mrs. Cathey's mother, Pauline Eubank, was hospitalized after suf-

fering an attack at home. While Mrs. Eubank was in the hospital, Mrs. Cathey received a telephone call from Ed Johnson (now employed by Volunteer Realty Company) asking if she was interested in selling her house. He told her that Fred Smith was interested in buying it. Mrs. Cathey denied that she ever formally listed the house with Mr. Johnson, but she did express a willingness for him to show the house.

For several weeks Condon Bush had been searching for a home in Knox County into which he and his family could move from Wisconsin. He had been guided by several real estate agents to look at houses, none of which had suited his needs. Two of the houses which he looked at were listed with Mr. Johnson, who was also present during the showing. In order to "put another real estate man on the job," Mr. Bush contacted Mr. Johnson, and together they looked at several other houses.

On March 2 Mr. Bush, unaccompanied by his wife, was first shown the Cathey home. On the following day Mr. Bush flew back to Wisconsin to discuss the matter with his wife. In the meantime Mrs. Cathey and Mr. Johnson had been negotiating a purchase with Fred Smith, and on March 4 Mr. Smith called Mr. Johnson and said that he would meet her basic terms which consisted of a purchase price of $165,000 with $2500 in earnest money. Mr. Johnson testified that on the same day Mrs. Cathey said that she would wait until Mr. Bush looked at the house, and then "would see who came up with the best offer on the thing." Mr. and Mrs. Bush looked at the house on March 6 at about 4:00 p. m. and later that afternoon prepared a written agreement in which the Bushes offered Mrs. Cathey $165,000 cash including $3000 earnest money with closing on June 1, 1978, and delivery of possession on June 15, 1978. The circumstances under which Mr. Johnson conveyed the offer to Mrs. Cathey are set out in the Defendant's brief as follows:

> Ed Johnson took the offer that evening at or about 9:00 p. m. to Betty Cathey's house, but found her not at home. Ed Johnson said that he believed Mrs. Cath-

ey was avoiding him on that evening. Johnson was at that point proceeding under instructions from the Bushes to "expedite" the contracting process, to get it "done as quickly as you can." Thus, since Betty Cathey avoided him on Monday evening, Ed Johnson took the offer back to her home (unannounced), arriving first thing the next morning. He said it was about 8:30, Mrs. Cathey said that he arrived about 7:30 a. m., before breakfast and while she was still in the bathtub. As Mrs. Cathey describes the events of that morning, she received a number of phone calls about unrelated matters in the short time that Ed Johnson was there, and she expressed to him great uncertainty about whether she ought to sign this contract that he presented to her. Her testimony was that she asked Johnson to leave, that it was too early in the morning for her to consider such a matter, and that in any event a number of other things were in urgent need of her attention. She also testified that she asked Mr. Johnson (after he refused to leave) if the contract could not be amended to allow her fifteen days within which to look for another place to live and to make up her mind whether she really wanted to sell. She testified that Ed Johnson told her that that could not be done. Except as concerns the exact time of day when he came to her home, Ed Johnson did not contradict any of Mrs. Cathey's description of the events of that morning; when asked specifically whether she had requested a provision in the contract to allow her time to think about it, Mr. Johnson said simply, "I don't recall."

Mrs. Cathey made two changes in the written agreement: (1) a provision requiring her to replace the guttering was deleted; and (2) the amount of earnest money was increased from $3000 to $5000. Thereafter, she signed the document which counsel for the Appellant refers to as a counteroffer.

Meanwhile, Mr. Bush had taken his wife to the Knoxville Airport where she was to

board a plane for Wisconsin. Mr. Johnson reached Mr. Bush at the airport by telephone and informed him of the changes which Mrs. Cathey had made. After Mrs. Bush boarded the plane, Mr. Bush returned to the office of Mr. Johnson where he affixed both his initials and those of his wife to the changes made by Mrs. Cathey and delivered a check for $5000. Mr. Bush testified that Mrs. Bush told him to sign her initials to the contract, and later, in Mr. Johnson's office, affirmed the act by saying, "He did that under my instructions."

On March 11 Mrs. Cathey called Mr. Johnson and told him that she was unwilling to sell her home. On March 15 she conveyed the same information to Mr. Bush, but he had already been informed of such by Mr. Johnson. Mrs. Cathey has since refused to deliver possession. Because Mr. Bush had assumed a position with a canning company headquartered near Knoxville, he was forced to buy another home within the city.

Expert testimony was introduced for the Defendant which tended to show that Mrs. Cathey had been in a state of severe emotional depression since the death of her husband. The opinion was also expressed that as a result of the depression she would be "susceptible to influence" and that her judgment would be impaired. However, the record also reflects that in addition to her work at the Culp Realty Agency she headed the Women's Division in Knox County for a gubernatorial candidate, as well as rented and managed approximately 25 pieces of real estate in the Knoxville area.

Plaintiffs introduced the expert testimony of a real estate broker familiar with the Knoxville real estate market. In the opinion of the broker, the fair rental value of the Cathey residence was estimated at $1333 per month. Further, the Plaintiffs introduced expert testimony of moving expenses which would be necessitated by a second move should the Court find in their favor. The expenses of the move between the two Knoxville residences were estimated to be $2233.

Turning first to the question of the legal enforceability of the contract, the Defendant urges us that since Mr. Bush affixed his wife's initials to the alleged counter-offer, that the agreement was not complete since both promisors did not manifest their assent. We agree that the Bushes' purported acceptance that altered the terms described in the original document that was executed by Mrs. Cathey was not an acceptance, but was indeed a counter-offer. *Canton Cotton Mills v. Bowman Overall Co.*, 149 Tenn. 18, 257 S.W. 398 (1923). However, because the sale was for cash, we agree with the Plaintiffs that the principal reason that the initials would be required is to satisfy the statute of frauds. T.C.A. 23—201(4) provides:

*Writing required for action.*—No action shall be brought:

.　　　.　　　.　　　.　　　.

(4) Upon any contract for the sale of lands, tenements, or hereditaments, .　　.

.　　　.　　　.　　　.　　　.

Unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized.

In contracts for the sale of land, the vendor is "the party to be charged therewith." *Lee v. Cherry*, 85 Tenn. 707, 4 S.W. 835 (1887); *Frazer v. Ford*, 39 Tenn. 463 (1859). Evidence of the acceptance of the contract upon the part of the purchaser may be in parole as at common law before the statute of frauds. *Lee v. Cherry*, supra; *Patterson v. Davis*, 28 Tenn.App. 571, 192 S.W.2d 227 (1945). We find that the oral authorization to her husband to place her initials on the counter-offer is sufficient to constitute him her agent for the purpose of affixing her initials as evidence of her acceptance of the contract changes. Therefore, his act is a sufficient manifestation of present contractual intent on the part of Mrs. Bush to constitute an acceptance within the meaning of the statute and the common law.

We feel that such a result is consistent with T.C.A. § 64–503 which provides as follows:

> *Execution by agent.*—Instruments in relation to real or personal property, executed by an agent or attorney, may be signed by such agent or attorney for his principal, or by writing the name of the principal by him as agent or attorney; or by simply writing his own name or his principal's name, if the instrument on its face shows the character in which it is intended to be executed.

Although the plain meaning of the statute would seem to indicate that the instrument on its face must reflect the agency when executed by an agent who simply writes the name of the principal, we feel that the act of Mr. Bush in affixing his wife's initials to the counter-offer was well within the spirit of the statute. First, in *Wilkerson v. Dennison*, 113 Tenn. 237, 80 S.W. 765 (1904), the Tennessee Supreme Court upheld the authority of a deputy court clerk to sign the name of the clerk and stated that "the authority of a deputy of a public officer is also somewhat similar to that of a private agent, who, it is well settled, may contract in the name of [the] principal, signing it alone without any reference whatever to himself. Mechem on Agency, §§ 428, 429, 433, 434." Secondly, the purpose of T.C.A. § 64–503 is not to limit the mandatory forms of execution of an instrument by an agent to those specified, but is intended to protect agents from personal liability on instruments executed in their fiduciary capacities. See *Wyatt v. Davidson*, 1 Tennessee Cases (Shannon) 613 (1876). Thirdly, Mrs. Bush ratified the act by saying in Mr. Johnson's office, according to her husband's testimony, that "he did that under my instructions." Finally, we find nothing in the record to indicate that at the time of the signing of the initials by Mr. Bush, which evidenced the acceptance of himself and his wife, that any of the parties did not desire to be bound by the instrument executed.

■ Although we are inclined to agree with the Chancellor that Ed Johnson was the agent of Mrs. Cathey and not Mr. Bush, for the reasons that he cites in his memorandum opinion,[1] we find it unnecessary to reach the question because we find insufficient evidence in the record to conclude that the Defendant was overreached. The Court feels a great deal of sympathy for the Defendant because of the death of her husband and the series of emotional problems which she has experienced in recent years. However, as already noted, the record also reflects that Mrs. Cathey possessed sufficient presence of mind to carry out the task of Women's Division campaign manager, as well as rent and manage a large real estate holding. In addition, Mrs. Cathey was a licensed realtor. Finally, there is no proof in the record of any inadequacy of price.[2] We feel that the depression of the Defendant and the fact that she was visited by Johnson at approximately 8:30 a. m. to complete the details of the purchase agreement, are insufficient to indicate duress or oppression in light of the aforementioned circumstances.

■ Specific performance will not be decreed where the situation of the parties is such that it would be harsh, inequitable, oppressive, or result in an unconscionable advantage. *Moss Tie Co. v. Hill*, 191 Tenn. 582, 235 S.W.2d 587 (1951). On the other hand, when the contract is valid and no injustice will result, the courts are bound to enforce it. *Sanders v. Sanders*, 40 Tenn. App. 20, 288 S.W.2d 473 (1955). While we agree with the Defendant that specific performance may not be decreed unless there exists mutuality of remedy between the parties, *Leathers v. Deloach*, 140 Tenn. 259,

1. The Chancellor relied on the fact that Mr. Johnson had stated to Mr. Bush that he had a prior obligation to Mr. Smith. Moreover, Mrs. Cathey, who had executed contracts for Mr. Bush and Mr. Smith, made minor changes in each and said she didn't care which one bought it.

2. Counsel for Mrs. Cathey stipulated in oral argument that the purchase price represented the full value of the property.

204 S.W. 633 (1918); *Carr v. Ott*, 38 Tenn. App. 585, 277 S.W.2d 419 (1954), since we have found that Mrs. Bush did in fact accept the counter-offer the remedy of specific performance would be available to Mrs. Cathey against Mr. and Mrs. Bush. And since the remedy is available to Mrs. Cathey, it is available against Mrs. Cathey. Therefore, we conclude that a valid contract existed between the parties and that the Chancellor properly decreed specific performance.

Turning to the question of damages, we note that the proof shows that the fair rental value of the residence was $1333 per month and that the written agreement called for delivery of possession not later than June 15, 1978. Since the case was tried February 14, 1979, the Chancellor concluded that the Plaintiffs were entitled to recover the fair rental value of the property for a period of eight months or $10,664. The Chancellor then reduced the award to a net of $5000 based on his personal knowledge of costs related to owning a home. We agree with the Plaintiffs that the Chancellor may not consider his own personal knowledge in order to reduce the fair rental value of a residence to a lesser amount. In this regard Chancellor Gibson said the following:

> *His Own Knowledge of the Facts* cannot be considered by the chancellor, any more than a juror can take into consideration his own personal knowledge of facts pertinent to the case. Every suit must be determined on the facts found in the record of the cause. The Chancellor's private knowledge of facts is the knowledge of the *man*, and not the knowledge of the *officer.* Were the rule otherwise, the Chancellor might decide the case on a state of facts that would not appear in the transcript on appeal, and would, therefore, be unknown to the appellate court.

*Gibson's Suits in Chancery* (1955), 5th Ed., Vol. 1, Section 459, pp. 523, 524.

■ Moreover, we feel that this is not a matter of which the Court may take judicial notice, because real estate value as well as tax and insurance rates are not matters which every well informed citizen of the State is presumed to know. See *Gibson*, supra, at 526. Rather, we feel the matter at hand is akin to that which the Middle Section of this Court dealt with in *Green v. Lanier*, 61 Tenn.App. 487, 456 S.W.2d 345 (1970). In deciding the question of whether a court could by judicial notice find that a savings and loan association is a bank or the same as a bank, the Court held the following (61 Tenn.App. at 501, 456 S.W.2d at 352):

> It might be plausibly urged that the chancellor and this Court ought to take judicial notice of the nature of savings and loan associations and deposits or investments therein. The chancellor doubtless had some personal information on this subject, and the members of this Court are not entirely ignorant of such matters. Personal information is not judicial notice, however; and this is especially true when application of such information would be based upon speculation and conjecture because of failure of the record to satisfactorily identify the object of desired judicial notice.

■ Therefore, we hold that the Plaintiffs are entitled to the fair rental value of the residence for the period in which they would have been in possession had both parties acted according to the terms of the agreement, and that the Chancellor acted improperly in reducing the award based on his own personal knowledge.

■ However, although a court of equity may compensate the purchaser for any loss of the use of the property during the period in which he has been denied possession by awarding him the fair rental value for the period, it must also compensate the vendor for any loss of the use of the purchase money during the delay by awarding him the appropriate interest for the period. Moreover, the court must give credit to either party for such expenditures that it has occasioned in relation to the property, such as taxes, assessments, insurance premiums, repairs and the like. Although there is no authority in Tennessee for such a

proposition, we note a wide variety of cases from other jurisdictions. See 7 A.L.R.2d 1204, et seq. In this regard we also note that the proof adduced at the trial level is most incomplete. Additionally, the award only contemplated damages for the period ending at the entry of the judgment. Therefore, we remand the case so that the parties may introduce proof to enable the Chancellor to make a finding as to the appropriate damages.

Finally, the Chancellor made no award of damages to compensate the Plaintiffs for additional moving expenses incurred as a result of Defendant's failure to perform. In regard to the adequacy of specific performance as a remedy, Professor Corbin stated the following:

> A decree for specific performance seldom brings about performance within the time that the contract requires. In this respect, such a decree is nearly always a decree for less than exact and complete performance. For the partial breach involved in the delay or in other existing non-performance, money damages will be awarded along with the decree for specific performance.

*5A Corbin on Contracts*, § 1160, p. 187.

Tennessee law allows recovery of all damages which are the normal and foreseeable result of the breach of a contract. *Wilson v. Dealy*, 222 Tenn. 196, 434 S.W.2d 835 (1968). We think it normal and foreseeable under the circumstances of this case that Plaintiffs would be required to move into a temporary residence pending the outcome of this litigation. Further, the Plaintiffs will again be required to move their personal goods and furnishings from their temporary residence to the home purchased from Mrs. Cathey. Therefore, we feel that the Chancellor erred in not allowing an additional award to compensate for the additional moving expenses.

For the foregoing reasons the judgment of the Chancery Court is affirmed in part and reversed in part and the case remanded for proceedings not inconsistent with this opinion. The costs of appeal are adjudged one-half against the Plaintiffs and one-half against the Defendant and her sureties.

PARROTT, P. J. (E. S.), and FRANKS, J., concur.