File Name: 06a0456n.06
Filed: June 29, 2006

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 05-5593**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED |
| v. | ) ) | STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant-Appellee. | ) ) | |

Before:  GIBBONS and COOK, Circuit Judges; SCHWARZER, Senior District Judge.[*]

COOK, Circuit Judge.  Plaintiff Metropolitan Government of Nashville and Davidson County, Tennessee (Metro) hired defendant State Street Bank and Trust to act as a custodian of trust fund assets supporting Metro's employee benefit plans.  In this action, Metro claims State Street erroneously reported that it had custody of Metro's stock certificate in Z-Tel Technologies, Inc. and thereby delayed Metro's ability to sell the stock as its price declined.  The district court granted State Street's motion for summary judgment on the ground that Metro failed to show how its injuries were caused by State Street's alleged error.  We affirm.

---

[*]The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

I

Metro's employee benefit system is managed by The Metropolitan Employee Benefit Board and a smaller, four-member Investment Committee. The Investment Committee hires private investment managers to buy and sell specific fund investments according to the Committee's guidelines. Beginning in August 1999, State Street, as custodian of the trust fund assets, was required to provide monthly reports to Metro, including valuation and performance information, as well as an account of transactions during the reporting period. State Street was to list all "unsettled" transactions, for which State Street did not yet have custody of the underlying security.

In December 1999, Metro's holding in Sewanee Ventures II, L.P. liquidated, entitling Metro to receive $187,000.00 in cash and 519,741 shares of Z-Tel stock. Metro's investment manager at the time, Walter Messemer, directed Sewanee's managing partner to send both the cash distribution and the stock certificate to State Street. In January 2000, Messemer received the cash distribution and forwarded it to State Street. Z-Tel mailed the stock certificate to Messemer on February 23, 2000, but (according to Metro) Messemer never received it, and the certificate never came into State Street's custody. Nonetheless, the March 30, 2000 quarterly report and several later reports neglected to list the Z-Tel distribution as unsettled. Metro claims that until State Street told it otherwise on October 24, 2000, Metro believed that State Street possessed the Z-Tel certificate.

Much of the current dispute focuses on when the Benefit Board resolved to sell the Z-Tel stock. At a September 27, 2000 Board meeting, Metro's Treasurer, Celia Kirby, recommended that

a private investment manager be selected to monitor the stock and to advise Metro as to when to sell. (*See* J.A. 48 ("[O]ur recommendation is that we ask one of our managers who's familiar with the [Z-Tel] stock to have oversight. Leave it where it is in the portfolio, but have oversight and advise us when to sell.").) Metro's investment consultant, Rich Ranallo, suggested instead that an investment manager be given not just advisory responsibility, but actual discretion to hold or sell the stock. (*See* J.A. 49 (noting that such a course would be "better than [the Board] deciding to sell it, because you do have insulation").) Ranallo predicted that the particular investment manager would decide what to do with the Z-Tel stock based upon whether it was in the manager's "model portfolio." If its model portfolio did not contain Z-Tel, then the manager would most likely dispose of the stock, and granting the authority would thus be "*similar* to a sell decision." (J.A. 49 (emphasis added).) But even then, the manager would only gradually dispose of the stock so as not to over-saturate the market and depress the sales price. Metro's Chairman of the Board, David Manning, asked whether Ranallo could "effectuate an arrangement [that would give an investment manager] flexibility to make the right decision on the timing [of the sale or] whatever it is they decide to do with it." (J.A. 55.) The Board—expressly without choosing a particular manager (J.A. 58)— then directed Ranallo to work with the private investment managers "'to work out an arrangement which [would be] in the best interest of the fund for the short term management of [the Z-Tel stock].'" (*Id.*)

On October 24, 2000, after an extended email exchange, State Street informed Kirby that it did not have possession of the Z-Tel stock certificate. As of that date, Metro was still consulting

with its private investment managers as to whether to hold or sell the stock. (*See* Kirby Dep., J.A. 149-50 ("The point of consulting with an investment adivsor [sic] or investment manager was to get their advice on how to handle the sale of it or the holding of it, depending.").) This remained the case on November 3, 2000, when the Benefit Board decided that Kirby, Messemer, and Ranallo should work together on a recommendation for the management of a group of nine stocks that included Z-Tel.

Also crucial to the current dispute are Metro's efforts to obtain a replacement Z-Tel certificate. Upon learning that State Street did not have custody, Metro contacted Z-Tel, which insisted that before it would issue a replacement Metro either (1) provide an indemnity bond or (2) pay two percent of the market value of the outstanding shares and sign an affidavit affirming its belief that the certificate had been "lost, stolen or destroyed." (J.A. 706.) Metro refused to do either.

Z-Tel issued a replacement security without a bond or affidavit on May 30, 2002. Metro then assigned managerial responsibility for the holding to an investment manager. The manager disposed of the holding sometime after November 2002.

In September 2003, Metro sued State Street for negligent care, custody, and control; negligent misrepresentation; breach of fiduciary duty; breach of contract; violation of federal banking law; and violation of state banking law. State Street removed the action to federal court on the basis of diversity jurisdiction and following discovery moved for summary judgment. Finding

that Metro's proffered facts failed to establish that its damages were caused by State Street's conduct, the district court granted State Street's motion as to all claims. Metro timely appealed.

II

We review the district court's grant of summary judgment de novo. *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 405 (6th Cir. 2004). We view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Metro's appeal exclusively addresses the district court's grant of summary judgment with respect to its state law claims for negligent representation and breach of contract. For these claims we apply the substantive law of Tennessee, the forum state. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). And under Tennessee law, causation of damages is an essential element of each of these claims for relief. *See McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998) (causation is an element of a negligence claim); *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996) (under Tennessee law damages must flow from the alleged breach of contract).

The district court rested its holding on the rule that a party suffers no injury from the delayed tender of a security if the party would not have sold the security during the period of the delay. *See Kaufman v. Diversified Indus., Inc.*, 460 F.2d 1331, 1336 (2d Cir. 1972); *Shearson Loeb Rhoades, Inc. v. Medlin*, 468 So. 2d 272, 273 (Fla. Dist. Ct. App. 1985) ("A showing of entitlement to damages under the general rule is accomplished by the plaintiff demonstrating that, had he possessed the shares, he would have sold them during the interim between the date of breach and the actual date of delivery. Otherwise, he would be no worse off because of the delay."). The court found that Metro failed to establish that it would have sold the Z-Tel stock at any point before October 24, 2000, the date it learned that State Street did not have custody of the certificate. The court thus concluded that Metro failed to establish that it was injured by State Street's conduct.

Metro attacks the district court's conclusion on two fronts. First, it contends that State Street's liability did not end when it informed Metro that it did not have custody of the Z-Tel certificate but rather on the day in May 2002 when Metro finally received a replacement. Metro contends that the foreseeable result of State Street's misreporting was to delay Metro's application for a replacement security, and thus that State Street should cover the decline in the stock's value between the time that Metro would have received a replacement had State Street reported correctly and when the replacement arrived. Second, Metro contends that there was a disputed issue of fact as to whether Metro decided to sell the Z-Tel certificate at the September 27, 2000 meeting, and thus that the district court, in holding that it did not, improperly resolved a factual issue at summary judgment.

Metro is onto something with the first argument, as foreseeability is the touchstone of contract damages, both in Tennessee and elsewhere. *See Bush v. Cathey*, 598 S.W.2d 777, 783 (Tenn. Ct. App. 1979) ("Tennessee law allows recovery of all damages which are the normal and foreseeable result of the breach of contract."); *Hadley v. Baxendale*, (1854) 9 L.R. Exch. 341, 355-57. State Street would have expected Metro to replace the Z-Tel stock as soon as it discovered it missing. And State Street would have expected Metro to be injured by its inability sell the stock (if it wished to do so) over the period of delay in obtaining a replacement caused by State Street's misreporting. Put simply, if nineteen months (October 2000 - May 2002) were the foreseeable period of time it would take for Metro to obtain a replacement certificate, then State Street would be liable for the decline in the stock's price from November 2001—when Metro would have received the replacement had there been no misreporting (nineteen months after the actual misreporting began)—until May 2002, assuming that Metro would have wanted to sell the stock over the course of that period.

But nineteen months was not the foreseeable amount of time that it would take Metro to replace a missing certificate. Metro could have obtained a replacement certificate immediately after learning that it was missing either by indemnifying Z-Tel or by paying a two percent penalty and executing an affidavit. By failing to pursue either means, Metro prevented itself from being able to sell the Z-Tel stock as its price declined. The failure to obtain a replacement thus constituted a failure to mitigate damages.

Metro contends that it was unable to meet Z-Tel's conditions for obtaining a replacement security—apparently for the entirety of the nineteen months—and thus that it did not fail to mitigate its damages. Metro first claims that it was prohibited by the Tennessee Constitution from indemnifying Z-Tel. State Street does not challenge this assertion. Metro then claims it could not execute an affidavit saying that it believed the certificate "lost, stolen, or destroyed" because (1) it had never received the stock certificate and thus had "no way of knowing" (Reply Br. 4) its status; and (2) doing so would have undermined its claims against Z-Tel.

We find neither explanation persuasive. Given the facts available to Metro at the time, that Z-Tel claimed to have sent the certificate and that neither Metro nor State Street had possession of it, we wonder what else Metro might have believed other than that the certificate was "lost, stolen, or destroyed." Either Metro believed it to be physically intact but of unknown whereabouts (i.e., "lost"); physically intact and of known but concealed whereabouts (i.e., "stolen"); or not physically intact (i.e., "destroyed"). Moreover, Metro's assertion that it had "no way of knowing" whether the certificate was "lost, stolen, or destroyed" misses the point because the affidavit asked for a statement of belief, not knowledge. Finally, Metro would not have undermined its claims against Z-Tel by executing the affidavit. Nothing in the affidavit required Metro to disavow a belief that Z-Tel was *responsible* for losing, stealing, or destroying the certificate, either through its negligence or some intentional conduct. Thus even upon executing the affidavit, Metro still could have

proceeded against Z-Tel for damages.[1]

We conclude that Metro could have obtained a replacement Z-Tel certificate immediately upon learning that State Street did not have custody of the original and that by not obtaining the replacement Metro failed to mitigate its damages. The hornbook result is that State Street cannot be liable for any decline in the price of the Z-Tel stock that occurred after it informed Metro that it did not have custody of the certificate. *See* Restatement (Second) of Contracts § 350 cmt. f, illus. 16 (1981). State Street's liability turns only on what happened before it gave Metro a correct report, and only, as the district court properly found, on whether Metro decided to sell the Z-Tel stock prior to that time. State Street is potentially liable only for the decline that occurred between the time that Metro allegedly decided to sell (but was unable) and when State Street informed Metro that it did not have custody of the certificate (and Metro could have obtained a replacement). The district court concluded that Metro did not decide to sell the stock prior to learning that State Street did not have custody of it, and Metro contends that in so doing it improperly resolved a factual dispute.

At the September 27, 2000 meeting the Board resolved to ask an as-of-yet undetermined investment manager to monitor the Z-Tel stock for sixty days before merging the stock into its

---

[1]Metro does not argue that the two percent payment demanded by Z-Tel in addition to the affidavit justified its not obtaining a replacement certificate. Nor should it. Metro would have had to make the two percent payment regardless of State Street's misreporting. Thus State Street—inasmuch as Metro does not argue that the loss of the certificate was its fault—was not responsible for Metro facing that expense. And Metro could not have relied on that expense as a justification for not mitigating its damages.

No. 05-5593
*Metropolitan Gov't of Nashville v. State Street Bank & Trust*

portfolio. Metro insists that this constituted a "sell decision" because (1) at the minimum the Board expected the manager to sell the stock following the sixty day period and (2) the investment manager would be allowed to sell without additional authorization from Metro.

We note first that the parties do not dispute what actions the Board resolved to take at the September 27 meeting. The question is not what factually occurred, but rather whether what factually occurred constituted an attempt to sell, which would make State Street liable for Metro's subsequent losses. This is a legal question, and thus Metro is wrong to claim that in answering it the district court erroneously resolved a factual dispute. We turn then to whether the district court was correct in concluding that the Board's resolution did not constitute a "sell decision."

The importance of a "sell decision," whether or not one occurred on September 27, is that it would mark the point at which State Street's misreporting became a but-for cause of Metro's losses. Until then, even if State Street had never misreported the status of the Z-Tel certificate (and Metro had successfully obtained a replacement), Metro would have still been exposed to the decline in the stock's value. We can thus determine whether the September 27 resolution was a "sell decision" by asking whether the action would have stemmed Metro's losses were it not for State Street's misreporting.

The Board's resolution would not have limited Metro's losses, even if State Street had all along reported that it did not have custody of the Z-Tel certificate and Metro had previously obtained a replacement. Metro would have continued to take losses until the investment manager

- 10 -

that Metro simply *resolved to choose* actually attempted to sell the stock. It matters not that Metro expected the stock to be sold by whichever manager it ultimately chose, either during the sixty-day period or afterwards. Nor does it matter that Metro's resolution authorized the yet-to-be-named investment manager to sell the stock on its own. To repeat, Metro would have continued to suffer losses until the manager took an action that would have resulted in the stock being sold. Because Metro provides no evidence that the stock would have been sold immediately by virtue of its September 27 resolution, or at anytime prior to its learning that State Street did not have custody (when, as we concluded, it could have obtained a replacement), State Street cannot be held responsible for any of Metro's losses.

Metro's final challenge is that the district court ignored its "rescission argument." "Rescission involves the avoidance or setting aside of a transaction. It is an equitable remedy, available where the contract was induced by fraud or duress[,] or where one party unequivocally renounces the contract or is legally unable to perform." *Lamons v. Chamberlain*, 909 S.W.2d 795, 800 (Tenn. Ct. App. 1993) (citations omitted). Because Metro has put forth no evidence for such a claim, we hold that it fails as a matter of law. We do not consider whether Metro's complaint, which sought only "damages" and "[s]uch other and further relief as the Court deems just and proper," sufficed to support a claim for equitable relief.

III

Because Metro failed to mitigate its damages after learning that State Street did not have

custody of the Z-Tel certificate, and because Metro did not suffer damages before that point for which State Street's misreporting was a but-for cause, we affirm the district court's grant of summary judgment to State Street. We further reject Metro's argument for the equitable remedy of rescission.