671 So.2d 832 (1996)
Eric J. WIBORG, II, Appellant/Cross-Appellee,
v.
Andrew EISENBERG and Joyce Eisenberg, Appellees/Cross-Appellants.
No. 94-3037.
District Court of Appeal of Florida, Fourth District.
April 10, 1996.
Nancy W. Gregoire, Kevin J. O'Grady and Joseph Livio Parisi of Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellant/cross-appellee.
Nancy Little Hoffmann of Nancy Little Hoffmann, P.A., Fort Lauderdale, for appellees/cross-appellants.
HENNING, PATTI ENGLANDER, Associate Judge.
This is an appeal from a judgment directing specific performance on a land sales contract. We affirm the judgment for the reasons stated herein, but reverse and remand for an evidentiary hearing to determine the appropriate damages.
*833 On July 6, 1993, Eric Wiborg listed for sale with Arlene Wallach, his real estate agent, a vacant piece of property with an asking price of $325,000. In September of 1993, the Eisenbergs contacted Wallach regarding the property and a short time after viewing the property, the Eisenbergs again asked to meet with Wallach to execute a proposed contract offering $255,000. The initial offer was rejected by Wiborg as were several other verbal offers made by the Eisenbergs through Wallach. Wiborg consistently refused to lower his asking price below $315,000.
On September 28, 1993, the Eisenbergs advised Wallach they would accept Wiborg's counteroffer of $315,000. Wallach orally communicated that acceptance to Wiborg. The next day the Eisenbergs discussed with Wallach whether soil testing could be done on the property. Though Wiborg denies this conversation took place, the trial court found that the credible evidence established that Wallach spoke with Wiborg about this, and Wiborg agreed to the addition of a soil test provision in the contract.[1]
When Wallach dropped off the proposed contract at Dr. Eisenberg's office for his and his wife's signatures, she gave the Eisenbergs a notice (apparently unknown to Wiborg) that stated if the Eisenbergs wanted to make the contract contingent on the soil test, they should add a specific clause to that effect to the contract. Wallach testified that she believed that this was unnecessary because of the other inspection provisions in the contract.
On September 30, 1993, Wallach went to pick up the contract at the Eisenbergs' home. In her presence, Dr. Eisenberg wrote into the "Special Clauses" section a provision that "this contract is subject to a soil test for building suitability." Wallach then added the additional term "within thirty (30) days" after the language added by Dr. Eisenberg. These phrases were initialed by the Eisenbergs and the contract was taken by Wallach to get Wiborg's initials. Within one-half hour of Wallach's return home with the contract, the Eisenbergs called to tell Wallach the soil test provision was not necessary and to disregard it. They were not going to do a soil test. Wallach told them there was no need to physically strike the clause from their contract, as they suggested. She testified that she believed nothing needed to be done with the verbiage because the Eisenbergs had excluded the demand before it was even presented in writing to Wiborg. Wallach told Wiborg there was no need to initial the soil test provision in the contract because the Eisenbergs had withdrawn that provision. She testified that she did not tell Wiborg to physically remove it because, again she did not think such action was necessary.[2]
After receiving the written contract with the soil provision inserted, and despite his *834 earlier agreement with the soil testing provision, Wiborg refused to convey the property. Though he told Wallach he couldn't accept the contract because of potential divorce proceedings with his wife, his legal stance in the trial court was that the Eisenbergs' request for a soil test was a counteroffer to his offer which he never accepted. His support for this position is that he never initialed the change and thereby the Statute of Frauds had not been satisfied.
The Statute of Frauds requires that "any contract for the sale of lands ... shall be in writing and signed by the party to be charged therewith or by some other person by him thereunto lawfully authorized." § 725.01 Fla.Stat. (1993). It is well settled that a land sale contract requires the mutual assent of the parties to all material terms. David v. Richman, 528 So.2d 25 (Fla. 3d DCA 1988).
The trial judge below specifically found that:
The credible evidence in the instant case establishes clearly and convincingly that the parties agreed upon all the material terms of the agreement.
The evidence in the present case with respect to the formation of a contract is clear, convincing, definite, and certain and shows that [Wiborg] agreed to the soil test requirement in the contract, and authorized his AGENT [Wallach] to accept the offer for the sale of the property.... As such, the AGENT was given the authority to negotiate on behalf of the SELLER and used such authority to communicate an acceptance by the SELLER to the terms of the land sale contract.
Instead of finding a valid and enforceable contract under the Statute of Frauds, however, the trial judge specifically ruled that equity mandated that the issues be decided outside of the Statute of Frauds and specific performance should be ordered. In a scathing opinion, the trial judge stated that
The SELLER has demonstrated a lack of candor in his dealings with the BUYERS and has testified untruthfully in the course of the trial. This court can not and will not allow the utilization of the Statute of Frauds as a shield to perpetuate unfair dealings, when the party invoking its protection has perjured himself on multiple material points.
We find that the contract fully complied with the Statute of Frauds and it was unnecessary for the trial court to take the matter outside the Statute of Frauds. There clearly was a valid written contract as to all the material terms and those terms should have been found enforceable. This is so no matter which version of the evidence was believed. If the soil test issue had been agreed to by the parties, then the Seller's agent had adopted the language in writing for Wiborg when she herself inserted the additional "within 30 days" term into the contract that was initialed by the Eisenbergs. If the soil test provision was mere surplusage because of the inspection clauses already in the contract, there was no need to initial the unnecessary language. See Restatement (Second) of Contracts §§ 39, 59 (1979); see also Kitsos v. Stanford, 291 So.2d 632 (Fla. 3d DCA 1974). Finally, if Wiborg was unaware there was a soil test contingency being requested and did not grant his agent authority to approve it, then the Eisenbergs should be permitted to withdraw the request prior to its being communicated to Wiborg leaving the contract accepted as written without that terminology. See, e.g., Montone v. Bush, 167 So.2d 884 (Fla. 2d DCA 1964).
Thus, we find that the contract complied with the Statute of Frauds and specific performance on the real estate contract was appropriately ordered. We affirm all other issues raised by Wiborg.
On cross-appeal, the Eisenbergs contend that the trial court erred in refusing to grant damages incident to specific performance. The trial judge, basing his finding on Buschman v. Clark, 583 So.2d 799 (Fla. 1st DCA 1991), found that the Eisenbergs were not entitled to special damages which had not been pled with specificity as such damages were not contemplated by the parties nor a natural or proximate result of any alleged breach. The trial court's reliance on Buschman is misplaced as that case relied on principles applicable to breach of contract *835 cases, and not the principles applied when specific performance has been granted.
This court has previously found that "`damages' awarded incident to a decree of specific performance are clearly different from those which would be awarded for breach of the contract." Walker v. Benton, 407 So.2d 305, 307 (Fla. 4th DCA 1981). Damages awarded in specific performance are a way of compensation to adjust the equities between the parties to place them in a position that they would have occupied had the contract been timely performed. Walker, 407 So.2d at 307. This court explained that "[t]he court is really requiring an accounting in its attempt to adjust the equities between both parties in order to return them to their relative position at the time of closing." Id.
Accordingly we reverse the trial court on the issue of damages and remand for an evidentiary hearing to determine the appropriate damages. We further find that appellees are entitled to attorney's fees based on paragraph 27 of the contract between the parties and remand to the trial court for a determination of those fees as well.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
GUNTHER, C.J., and SHAHOOD, J., concur.
NOTES
[1] At pages 265 through 266 of the transcript, the following exchange transpired on Ms. Goldman's redirect examination:

Q. I have a couple of questions. Counsel asked you if he never accepted the change. He knew the soil test was going to be written into the contract, didn't he?
A. Yes.
Q. And he had approved it, the addition of that language, didn't he?
A. He approved that it was going to be entered in there. I asked him if it would be okay to do it and he said yes, it was.
Q. Your testimony wasdid you expect that he would be initialing it if the Eisenbergs had not called and said forget about the testing?
A. Yes. He knew it was going to be there. I was already waiting for him to come. We had made plans before for him to come and initial it. He was supposed to come that night and do that.
[2] On pages 234 through 235 of the transcript the following exchange transpired:

Q. Did you believe Mr. Wiborg had to initial that soil testing language there?
THE WITNESS: No, I didn't.
Q. Well, as part of your job, you had him initial other things, why didn't you have him initial that?
A. Because the Eisenbergs had added it in, then they told me they weren't going to do it and it really was not significant, it had nothing to do with anything. It was added in and there wasn't going to be done anyway and there was no reason for him to agree to something that wasn't going to have anything to do with anything, and I had even called him and told him he didn't have to come that night to my house to initial the contract because they didn't need to be initialed and I didn't think that they did.