# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 8, 2025 Session

## WILLIAM H. LUBLIN V. VASTLAND NORTHCREST DEVELOPMENT, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 22-0737-II     Anne C. Martin, Chancellor**

---

### No. M2024-01152-COA-R3-CV

---

This matter arises from two failed real estate transactions. A buyer contracted to purchase two townhomes from a real estate developer. However, after the sales failed to close, the developer purported to cancel the transactions. The buyer then sued the developer, seeking decrees for specific performance and damages for breach of contract. The buyer also asserted a claim under the Tennessee Consumer Protection Act. After a bench trial, the trial court entered an order awarding the buyer specific performance but denying his claim for damages. The trial court also found a TCPA violation and awarded the buyer his attorney's fees and costs. On the breach of contract claim, we have determined that the developer breached the contracts and that the buyer failed to sufficiently prove his damages, and we affirm the trial court's decision. We also conclude that the trial court erred in finding a TCPA violation and reverse this finding, as well as the award of fees and costs pursuant to the TCPA. Finally, we have determined that the developer was not the prevailing party in the trial court or on appeal and deny its request for an award of attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JEFFREY USMAN, J., joined.

J. Ross Pepper and Jimmy B. Meeks, Nashville, Tennessee, for the appellant, Vastland Northcrest Development, LLC.

Matthew W. McInteer and Justin F. Seamon, Nashville, Tennessee, for the appellee, William H. Lublin.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

On May 21, 2022, William Lublin, a real estate professional and investor from Pennsylvania, filed two complaints[1] in Davidson County Chancery Court against Vastland Northcrest Development, LLC ("Vastland Development"), a Nashville-based property development company owned by Mack McClung. In the complaints, Mr. Lublin alleged Vastland Development breached two real estate sales contracts and violated the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101 to -138, because of Vastland Development's refusal to sell two townhomes to Mr. Lublin. The complaints sought specific performance of the contracts, treble damages, an award of attorney's fees, and injunctive relief.

As to the breach of contract claims, Mr. Lublin alleged that, in July 2021, he had entered into two contracts with Vastland Development to purchase two townhomes (one townhome per contract) in Dry Creek Commons, a townhome community that Vastland Development was building in Goodlettsville, Tennessee. Each contract contained an anticipated closing date of March 30, 2022; however, neither property had closed on that date, and Vastland Development had since purported to cancel the contracts. Mr. Lublin also asserted that Vastland Development had violated the TCPA, alleging that it had engaged in unfair and deceptive practices that caused Mr. Lublin an ascertainable loss.

On July 7, 2022, Vastland Development filed its answer, denying that it violated the contracts or the TCPA. As defenses, Vastland Development asserted that Mr. Lublin committed the first material breach of the contracts and that the company had the right to void them. Vastland Development also asserted a counterclaim for a declaratory judgment that it was allowed to unilaterally void the contracts. Vastland Development requested that the contracts be found null and void or, in the alternative, that the matter be remanded for mediation, for the court to remove the liens lis pendens, and an award of attorney's fees. Mr. Lublin filed an answer to Vastland Development's counterclaim on August 8, 2022.[2]

The matter was tried on May 6-9, 2024. Testimony was provided by Mr. Lublin; Mr. Lublin's Nashville-based real estate agent, Brian Copeland; the managing broker for the transactions, Tamara Senibaldi; the onsite real estate agent for Vastland Development, Beth Tippitt; and an employee of Rudy Title & Escrow, Margaret Means. Portions of a previous deposition of Mr. McClung were played for the court, and he also provided live

---

[1] Mr. Lublin filed two nearly identical complaints, differing only in the addresses and purchase prices for each property. The matters were consolidated on November 22, 2023, and the litigation proceeded as a single matter.

[2] After Vastland Development sought to rent or rent-to-own the properties, Mr. Lublin sought and obtained a temporary injunction on February 16, 2024, preventing the rental or sale pending trial.

testimony. Additionally, numerous exhibits were submitted, including the relevant contracts and messages between various individuals, including Mr. Copeland, Ms. Tippitt, and Mr. Lublin. The trial court thereafter took the matter under advisement.

The trial court entered its memorandum and order on June 14, 2024, in which it made findings of fact. We summarize the relevant factual findings thusly: Mr. Lublin was introduced to the Nashville area and Dry Creek Commons through Mr. Copeland. Mr. Lublin signed the contracts on July 24, 2021. The contracts were identical except for the prices and addresses of each unit.[3] The court then quoted[4] the following important provisions of the contracts:

> **LOAN APPLICATION** Although Buyer's obligations hereunder are not conditioned on Buyer qualifying for a mortgage loan or otherwise obtaining financing for purchase of the house, Buyer agrees to make application for loan within 3 (three) days of acceptance date below and to pay all loan expenses unless otherwise herein noted. Buyer shall present a loan commitment or other evidence of Buyer's financial ability to perform to Seller within 21 (twenty-one) days of acceptance date below. If Buyer fails to provide loan commitment or other evidence of Buyer's financial ability to perform within 21 (twenty-one) days of acceptance date below then Seller, at its option, will require Buyer to make application with Buyer's Preferred Lender (if Buyer has had loan rejected from another lender) or declare a breach of this contract and pursue any and all remedies against Buyer. Buyer agrees to take reasonable care to provide for financing diligently and in good faith and will do nothing to circumvent the loan process. Buyer shall continually and immediately provide requested documentation to Lender and shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain said financing. Buyer agrees to provide Seller, upon request of Seller, information on the status of their loan application and commitment and Buyer hereby grants to Seller and its agents the right and power to contact and discuss with the Buyer's lender the status of Buyer's loan.
>
> . . .
>
> **COMPLETION, CLOSING & POSSESSION** Present stage of construction: <u>NA</u>.

---

[3] These limited differences have no impact on the interpretation of the contracts.

[4] All quotations in this portion of the opinion are taken from the trial court's order.

Home is to close no later than <u>March 30, 2022</u>. If pre-sale/construction contract the closing shall be on or about <u>180</u> days from the commencement of construction with an estimated delivery date of <u>March 30, 2022</u>. Final inspection and approval by the building inspector (Certificate of Occupancy) shall be mutually accepted by the parties as conclusive evidence that the house has been substantially completed according to the plans and standard features.

. . .

**DELAYS** Seller may extend this purchase agreement if delays in the completion of this home is due to inclement weather, unexpected material delays, delays caused by local governmental authorities, zoning, strikes, Acts of God or nature, or delays directly caused by Buyer's Work Orders and/or selection of materials or other unforeseen conditions beyond the Seller's control. Seller shall be held harmless and have no liability from damages resulting from such delays and the Closing Date may be extended by the number of days resulting from such delays not to exceed 180 calendar days.

In the event of war, riots, strikes, natural disasters, labor or material shortages, substantial price increases in labor or material, imposition of any government or utility company restrictions or allocations, or for other reasonable cause determined by the Seller, the Seller shall have the right to void this Purchase Agreement and shall not be liable for any failure or delay in construction.

In the event Buyer fails to complete the purchase of the home within five (5) days of substantial completion of the home, beginning with the sixth (6th) day following substantial completion, Buyer shall pay a Seventy-Five ($75.00) per day purchase price increase for each day for which closing is delayed. Such amount shall be paid to Seller as additional purchase price for the home and shall be payable irrespective of whether or not such delay is due to the fault of Buyer or the fault of Buyer's lender, or due to the fault of any third party. If the Buyer fails to pay the balance due at closing or fails to comply with any other terms of this Agreement, it shall constitute a default of the Buyer.

**DEFAULT BY BUYER** In the event of default by Buyer, the Buyer agrees that all amounts paid to the Seller prior to the default shall be retained by Seller, which in no way prejudice the rights of the Seller in any action for the damages or specific performance. If the Buyer is in default, the Seller may, without notice, sell the subject house and real estate to others.

The trial court further found that the contracts also included several relevant addenda. Addendum C, titled "Home Inspection Notification," allowed for Mr. Lublin to have the building inspected and to then provide a list of defects to Vastland Development for repair. Addendum D, titled "Incentive Agreement," provided incentives to Mr. Lublin for using Vastland Development's preferred title company, Rudy Title and Escrow, LLC, and for using its preferred mortgage lender, Cross Country Mortgage ("Cross Country"). If Mr. Lublin utilized both of these companies, Cross Country would provide $4,000 per contract ($8,000 total) in funds that could be used towards "rate buydowns, closing costs, and prepaids." At trial, Mr. Lublin testified that he agreed to use these companies to obtain the incentive bonuses and that he understood he was required to use both companies to receive the incentives. The incentive agreement also provided that, should Mr. Lublin decide to use a different lender, he was still obligated to purchase the properties but would lose the incentives. Another addendum required a $5,000 deposit, and another portion of the contracts provided for commissions due to the agents involved in the sales of the properties.

Although Mr. Lublin had chosen to comply with the Incentive Agreement terms by using Rudy Title and Cross Country, the court found that Mr. Lublin "always had sufficient funds to close with cash if necessary and maintained that liquidity throughout this dispute." After this, Mr. Lublin continued working with Cross Country to provide the necessary documents; however, he found the process frustrating and felt he had to provide the same documents several times. On April 18, 2022, he received an email from Cross Country informing him that his loan was moving forward towards final approval. Mr. Lublin also paid for several rate lock extensions and was concerned that the process would extend beyond April 15, 2022, because he would then have to provide updated tax returns. Regarding closing, the trial court found that:

> Lublin also intended to use Rudy Title as the title issuer and closing firm. It is undisputed that is the only title company either party communicated with regarding those products and services. Closings typically get scheduled through the parties working together, with the lender, to notify the parties they are ready to close because the property is done, and the lending package is ready. The Court recognizes that neither party can unilaterally schedule closing because of information needed from both sides and a determination of funds necessary to be provided by the buyer.

During this time, Mr. Lublin had little communication with Vastland Development, only communicating directly with Vastland Development on March 4, 2022, when Ms. Tippitt realized she had not collected the two $5,000 deposits from Mr. Lublin. Mr. Copeland also experienced some miscommunications with Vastland Development's site superintendents, and testified that, as an example, "he had walkthroughs scheduled and no one was at the subject unit when he arrived, or he was told units were ready and they were not."

On February 24, 2022, Ms. Tippitt emailed Mr. Copeland, estimating that the properties would be ready for walkthroughs and closings in early March. Mr. Lublin then tentatively planned to fly to Nashville for walkthroughs on March 17, 2022, with closings the next day. However, the closings did not occur on this date or on March 30, 2022 (the date of closing provided in the contracts), because construction was not yet complete. Mr. Lublin had previously asked for, and been promised, five days' notice of closing so that he could arrange for travel, and there were numerous times when Mr. Lublin put a tentative closing on his schedule, arranged for travel, and then cancelled because the properties were not yet ready.

On March 31, 2022, Mr. Copeland conducted an informal "blue tape walkthrough," after which he told Mr. Lublin that, based on the properties' status, he estimated it would be another two weeks before they were completed and that the properties were about 60% finished. Sometime thereafter, Ms. Tippitt told Mr. Copeland that they expected the properties to each be issued a certificate of occupancy by mid-April, and Mr. Copeland agreed that Mr. Lublin could close on the properties on April 15, 2022. After this, Ms. Tippitt messaged Mr. Copeland on April 13, 2022, that the electric meter had become disconnected from the properties, the exterior sod was missing and, as stated by the trial court, "Lublin would be expected to close 'without keys or CO.'" Mr. Lublin declined to do so, and no closing was scheduled. The properties were issued certificates of occupancy on April 14, 2022, and Vastland Development forwarded these to Mr. Copeland, who shared them with Mr. Lublin. At this time, Mr. Lublin did not have loan approval from Cross Country but continued to work with the lender and had no indication that his loan would not be approved.

On April 21, 2022, Ms. Tippitt texted Mr. Copeland that she had been informed that the properties would be ready for final walkthroughs the next week. After Mr. Copeland told Mr. Lublin that the properties were completed, Mr. Lublin responded that, "I'll make arrangements as soon as I know what's [what] . . . I don't have mortgage approval yet—I should, and yet I don't." As further stated by the trial court:

> [O]n Tuesday, April 26, 2022, Tippitt asked Copeland "Is Bill coming/closing on Thursday or Friday? Austin is planning walks." Copeland responded "We haven't heard [from] Tonya [Esquibel]. She's gone dark . . . Bill tried all day today too so far. Does she have a boss? I tried. He tried. Zero." Tippitt texted Esquibel to let her know Lublin was ready to close on Friday and needed financing resolving. Later that day Tippitt finally got in touch with Esquibel who, for the first time to anyone, stated that Lublin's loan was not approved using the products she had available through Fannie Mae/Freddie Mac because of the "complexities of his portfolio." Esquibel also told Tippitt she "connected Mr. Lublin with her local banker, who is able to utilize the loan packages created by Cross Country, including the appraisals, to close a commercial loan on the property for him within two

weeks." Tippitt spoke with Copeland on the phone and they texted regarding this news. Lublin agrees he would not have been a fit for those programs because he has too many real property assets and his mortgage would not be eligible for sale on the secondary market. He qualified as an investor and thus needed a different kind of financing. Addendum D, Incentive Agreement did not refer to Fannie Mae/Freddie Mac as the only loan programs Cross Country would make available and eligibility for those loan programs was not a contingency for the incentive. Regardless, at this point it was apparent Lublin was going to have to find other financing if he wanted to close with financing.

On Wednesday, April 27, 2022, Tippitt texted Copeland and stated "They are requiring that I send the cancellation form to you, but please ignore it until Bill [Lublin] decides about going the margin loan or cash route. Thank you." Copeland responded to Tippitt, "Bill intends on closing them. He will not be accepting the form." Tippitt and Copeland also spoke on the phone that day and Tippitt reiterated that Lublin needed to close soon if the deal was to be saved. This was the first indicator to Copeland and Lublin that Vastland Development did not intend to close or that it had a basis not to do so. Copeland had not had difficulties with his other clients closing at Dry Creek Commons, although none were denied financing as Lublin was. Tippitt was aware, through Copeland, that Lublin could close with cash. Although Tippitt had been instructed to send forms cancelling the Contracts, she did not have the forms yet and, operating in good faith, hoped the transactions still might close.

On April 28, 2022, Cross Country informed Rudy Title that Mr. Lublin was going to use FirstBank as his lender. Later that morning, Mr. Copeland emailed Rudy Title asking if they could get the units ready to close. That evening, Mr. Lublin emailed Rudy Title that he had been offered financing by FirstBank and that he "may just close the properties using cash," but that he was unsure of the state of the properties. The events surrounding the purported cancellation of the contracts were detailed by the court thusly:

On Sunday, May 1, 2022 in the evening, Tippitt texted Copeland "Brian, I was just required to send over the two notification/cancellation forms I mentioned last week to you. I did not send them to Bill, only to you. So sorry about all of this. I hope that Bill is able to close these! Beth." There were two sets of referenced forms, one for each of the Properties: i) a Tennessee Association of Realtors® form titled "Notification" used for formal communications between parties in real estate transactions; and ii) a Vastland Development form titled "Deposit Forfeiture or Release Form."

The "Notification" form contained a list of 35 checkboxes for each category of communication. On the forms, the box next to "Other" was checked. Next to this was written "Failure to communicate with lender and secure funding within the time limits of the contracts." The court detailed its findings regarding Mr. McClung's reasons for cancelling the contracts, finding:

> McClung, on behalf of Vastland Development, considered Lublin in breach of the Contracts based upon his failure to provide proof of a timely mortgage application, his failure to provide a timely loan commitment, and his failure to close. He felt Lublin provided excuses rather than scheduling a closing, and that if he had cash to close, he would have come to Nashville and closed that week. McClung never provided any notices to Lublin as to the basis for Vastland Development's refusal to close, and Vastland Development takes the position it was not required to provide notice at any time. McClung made some references to cost increases in labor and materials due to COVID, but did not cite that basis for not closing in 2022 with Lublin, did not do so as to any other transactions, and did not present any credible proof at trial regarding this being the reason he did not proceed forward with these closings. The Court does not find that basis to have any credibility in relation to the subject transactions.

On May 2, 2022, Mr. Lublin's counsel sent Vastland Development a letter rejecting the Deposit Forfeiture or Release form and reiterating his intention to close on the properties. Vastland Development did not respond to this letter. The trial court noted that, although this was the first time Mr. Lublin had provided proof of his ability to close with cash to Vastland Development, he had provided proof of this ability to Cross Country, and Ms. Tippitt had been aware of this ability "well before this date." The court continued:

> That week Lublin continued to work with FirstBank and although that bank requested a closing with Rudy Title on Friday, May 6, 2022 or Monday, May 9, 2022, no closing was ever scheduled as Vastland Development was no longer agreeable to selling the Properties to Lublin. Rudy Title did not have what it needed from Vastland Development to schedule a closing. McClung testified that Lublin could have wired his estimated cash amount to Rudy Title to signal his ability and willingness to close, even without a closing statement or a closing date. Rudy Title's witness testified this could only occur if the buyer had a good estimate of what was required to close, typically from a draft ALTA. The Court does not find this would have been a reasonable course of action as Rudy Title did not authorize the provision of funds, did not provide an amount Lublin was to provide for a closing, and did not, in fact, have authorization from Vastland Development to close. It is inconceivable that McClung would suggest a buyer doing so, to signal or

- 8 -

demonstrate his readiness to close, would be an appropriate course of action for a buyer to take.

In the aftermath of the properties failing to close and the instigation of the immediate litigation, Ms. Tippitt and Ms. Senibaldi both left Vastland Realty. The trial court found that Ms. Tippitt left her employment because of "how McClung handled the Lublin matter, as well as the stress associated with being subpoenaed for this trial." Ms. Senibaldi left her employment "in part because of how this transaction was handled, as well as for other reasons." The court found that both believed that Mr. McClung "was responsible for the transactions not closing and that he acted in bad faith in not closing with Lublin." The court also credited Ms. Tippitt's testimony that "she had no indication Lublin was not trying to close and that they all (Lublin, Copeland, the construction team, and herself) were attempting to get to the closing table in good faith."

The court next found that Vastland Development had breached the contracts, finding that "Vastland Development had no basis to unilaterally terminate the Contracts," and that it had "failed to provide notice and a reasonable opportunity to cure." The court concluded that Vastland Development's stated reasons for cancelling the contract were unsupported by the evidence and that Vastland Development had breached the contracts by failing to convey the properties to Mr. Lublin. The court also found Vastland Development's defenses that Mr. Lublin committed the first material breach and that the contracts allowed it to unilaterally cancel the contracts were without merit.

The court found that Vastland Development had violated the TCPA, concluding that it had engaged in unfair and deceptive trade practices that caused ascertainable loss to Mr. Lublin. The court reasoned that Vastland Development had caused confusion over Ms. Tippitt's authority to set the closing dates based upon Mr. McClung's testimony, Ms. Tippitt's messages, and the notification forms. The court also found that Vastland Development had acted in bad faith, as evidenced by the testimony of Mr. Lublin, Mr. Copeland, Ms. Tippitt, and Ms. Senibaldi. Only Mr. McClung testified that he had not acted in bad faith; however, the court specifically did not credit this testimony. The court found that Vastland Development's failure to close was knowing misconduct "because a reasonable person in Vastland Development/Tippitt's position knew, or should have known, that Lublin would rely on the statement made by Tippitt as to Vastland Development's intention to close and her assertion to ignore the Notifications." The court also awarded Mr. Lublin his attorney's fees under the statute.

The court also awarded specific performance of the contracts to Mr. Lublin. However, regarding Mr. Lublin's request for damages, the court found them to be too speculative to award. Regarding Mr. Lublin's request for his "mortgage-related" damages, the court found that his financing application with FirstBank never progressed beyond negotiations and that, therefore, it did not provide a basis to award damages. Regarding his request for his lost rental income, the court determined that these damages were too

speculative because the amount requested was based upon the total rental amount and no proof of other expenses was offered, thus creating an inflated request.

On July 11, 2024, the court entered an order awarding Mr. Lublin his reasonable attorney's fees. After considering the factors contained in Tenn. Sup. Ct. R. 8, RPC 1.5, the court found the requested fees unreasonable and awarded Mr. Lublin $198,677.93 in reasonable fees and costs. On August 9, 2024, Mr. Lublin filed a motion to alter or amend the judgment, in which he continued to assert that he should be awarded his lost rental income or that the court reopen the case to conduct an equitable accounting. The court denied this motion on September 30, 2024.

Vastland Development timely appealed and presents the issues of whether the trial court erred by: (1) finding it liable for breach of contract; (2) finding it liable under the TCPA; (3) awarding Mr. Lublin his attorney's fees and costs under the TCPA; and (4) by failing to award it its attorney's fees and costs. Vastland Development also seeks an award of its appellate fees and costs. Mr. Lublin raises the following additional issues: whether the trial court erred by failing to award him damages, and whether this court should award him his appellate fees and costs.

STANDARD OF REVIEW

After a bench trial, we review the trial court's findings of fact de novo upon the record, affording the findings a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802, 812 (Tenn. Ct. App. 2021). Questions of law, including interpretation of contractual terms, are reviewed de novo, without any presumption of correctness. *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 465 (Tenn. 2012).

"Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Therefore, we must give "considerable deference" to a trial court's factual findings in matters where the trial court "heard conflicting in-court testimony and issues of credibility are involved." *Easley v. City of Memphis*, 699 S.W.3d 268, 270 (Tenn. 2024) (citing *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013)). Accordingly, we require "clear evidence to the contrary" to reverse a trial court's credibility-based factual findings. *Id.* (quoting *In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). "This deference must be given to a trial court's express credibility determinations and those implied in its holdings." *Id.*

- 10 -

ANALYSIS

I. Mootness and waiver

Before addressing the issues presented by Vastland Development, we must consider Mr. Lublin's argument that the breach of contract issue has become moot or that Vastland Development has waived its right to appeal the breach of contract finding. The arguments surrounding this issue are related to Vastland Development's "partial satisfaction" of the judgment. On November 27, 2024, Mr. Lublin filed what is titled a "notice of partial satisfaction of judgment," wherein he represented to the trial court that, in accordance with the court's order, Vastland Development had "fully and completely satisfied the specific performance portion of the judgment by transferring and conveying" the properties to him and that he had in turn paid Vastland Development.

Because justiciability, of which mootness is a component consideration, is a threshold question for courts to analyze, *State v. Sokolosky*, 721 S.W.3d 215, 218 (Tenn. 2025), we first address mootness. Tennessee courts have limited their role to that of "deciding 'legal controversies.'" *Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009). "Under the doctrine of justiciability, courts will 'stay their hand in cases that do not involve a genuine and existing controversy requiring the present adjudication of present rights.'" *Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 651 S.W.3d 907, 912 (Tenn. 2022) (quoting *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994)). The requirement of justiciability remains throughout the proceedings, including on appeal. *Id.* "A case may be deemed moot if it loses its justiciability 'either by court decision, acts of the parties, or some other reason occurring after commencement of the case.'" *Id.* (quoting *Norma Faye*, 301 S.W.3d at 204). "The baseline, as observed in *Norma Faye*, is that a case is considered moot 'if it no longer serves as a means to provide some sort of judicial relief to the prevailing party.'" *Id.* at 916 (quoting *Norma Faye*, 301 S.W.3d at 204).

We do not find this matter moot because it continues to serve as a means of providing judicial relief to both parties. As to Vastland Development, were this Court to reverse the breach of contract claim, Vastland Development asserts that it would be entitled to its attorney's fees under the contracts. Similarly, the matter continues to serve as a means to provide judicial relief to Mr. Lublin, as he has appealed the court's damages decisions. These distinctions differentiate the present matter from cases cited by Mr. Lublin from other jurisdictions. *Cf. Thorn v. Walker*, 912 A.2d 1192, 1196 (D.C. 2006) (dismissing a case as moot after compliance with a specific performance decree, in part, because the court was not "presented with a case concerning money damages where relief at the appellate level might not be foreclosed"). The issues presented in the present matter are simply not the same as those in the cases cited by Mr. Lublin, wherein the sole issue presented was related to reversing a decree of specific performance and the subject property

- 11 -

had already been transferred. Here, other issues continue to exist, and this Court remains able to provide effective relief to the parties. Therefore, the matter is not moot.

We next consider Mr. Lublin's argument that Vastland Development has waived its right to appeal the breach of contract finding by voluntarily complying with the specific performance decree and conveying the two properties at issue to Mr. Lublin. In Mr. Lublin's words, "by knowingly and voluntarily accepting the benefits of the specific performance decree (i.e., receipt of the purchase price), Vastland is estopped from seeking reversal of that judgment on Mr. Lublin's breach of contract claim."

Conversely, Vastland Development argues that it did not waive its right to appeal and moves this Court to consider post-judgment facts; specifically, an email sent by its attorney, Jimmy Meeks, to Mr. Lublin's attorney, Justin Seamon, on July 8, 2024, and the accompanying declaration of Mr. Meeks. In the email, Mr. Meeks stated that Vastland Development intended to comply with the court's order to close on the properties; however, Mr. Meeks also stated that Vastland Development intended to "proceed with an appeal of the Court's rulings on both the breach of contract claim and the TCPA claim." Mr. Lublin has not filed anything in this Court to dispute the email's validity or put forward any argument regarding whether this Court should grant Vastland Development's motion.

Rule 14 of the Tennessee Rules of Appellate Procedure states, in relevant part:

(a) Power to Consider Post-Judgment Facts. The Supreme Court, Court of Appeals, and Court of Criminal Appeals on its motion or on motion of a party may consider facts concerning the action that occurred after judgment. Consideration of such facts lies in the discretion of the appellate court. While neither controlling nor fully measuring the court's discretion, consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters.

We have determined that the email submitted by Vastland Development is "capable of ready demonstration" and affects the positions of the parties. *See id.* Therefore, we will grant Vastland Development's motion and consider the submitted materials.

In resolving this issue, we find our decision in *Raley v. Brinkman*, 621 S.W.3d 208 (Tenn. Ct. App. 2020), to be instructive. There, the appellee filed a motion to dismiss the appeal on the ground of waiver, because the appellant had paid the first installment owed. *Raley*, 621 S.W.3d at 225. As this Court phrased it, "[s]tated another way, [appellee] contends [appellant] is estopped from challenging the unfavorable aspects of the trial court's judgment because [appellant] 'accepted and took advantage of substantial benefits'

- 12 -

of the trial court's" order. *Id.* After complying with the order, the appellant's counsel sent an email to the appellee's counsel stating that "the payment 'should not be construed as a waiver of any of [appellant's] issues with respect to the trial court's'" order. *Id.*

We then analyzed our Supreme Court's decision in *Catlett v. Indemnity Insurance Co. of North America*, 914 S.W.2d 76 (Tenn. 1995). *Raley*, 621 S.W.3d at 226-27. In *Catlett*, our Supreme Court quoted the following "general rule" approvingly:

> "A party who voluntarily acquiesces in, ratifies, or recognizes the validity of, a judgment, order, or decree against [that party], or otherwise takes a position which is inconsistent with the right to appeal therefrom, thereby impliedly waives, or is estopped to assert, [the] right to have such judgment, order, or decree reviewed by an appellate court;
> . . .
>     In order to be a bar of the right of appeal on the ground of acquiescence, the acts relied on as a waiver . . . must be such as to clearly and unmistakably show an inconsistent course of conduct or an unconditional, voluntary, and absolute acquiescence, with the intent to ratify or confirm the judgment, and to acquiesce and abandon the right of appeal."

*Catlett*, 914 S.W.2d at 78 (quoting 4 C.J.S. *Appeal and Error* § 185 (1993)). Therefore, we concluded that, to dismiss the appellant's appeal in *Raley*, the appellant's conduct must "'clearly and unmistakably show . . . the intent to ratify or confirm the judgment, and to acquiesce and abandon the right to appeal.'" *Raley*, 621 S.W.3d at 227 (quoting *Catlett*, 914 S.W.2d at 78). We found that the appellant's email precluded a finding that he had clearly and unmistakably shown an intent to ratify the judgment and abandon the right to appeal. *Id.*

Here, Mr. Meeks's email stated that, although Vastland Development intended to comply with the court's order, Vastland Development would "also proceed with an appeal of the Court's rulings on both the breach of contract claim and the TCPA claim." Mr. Meeks also stated that Vastland Development would attempt to regain ownership of the properties if its appeal was successful. From this, it was not clear and unmistakable that Vastland Development had abandoned its right to appeal. Therefore, we will continue to the merits of the case.

## II. Breach of contract

We turn next to the issues related to the trial court's finding that Vastland Development breached the contracts. We first examine Vastland Development's assertions regarding the trial court's conclusion that it breached the contracts with Mr. Lublin. After this, we examine Mr. Lublin's related arguments regarding the trial court's decisions not to award him damages from the breach.

- 13 -

## A. First material breach

Vastland Development asserts that Mr. Lublin cannot recover under the contracts because he committed the first material breach. To show that Mr. Lublin was first to breach the contracts, Vastland Development asserts that, although the contracts did not contain time-of-the-essence clauses, time was of the essence for Mr. Lublin's obligations because the contracts allowed the sale of the properties to someone else upon Mr. Lublin's default. Because time was of the essence, Vastland Development argues, Mr. Lublin breached the contracts when he failed to close within five days of the issuance of the certificates of occupancy and failed to provide proof of his financial ability to perform within 21 days of signing the contracts.

Vastland Development's arguments require us to interpret the contracts. As our Supreme Court has instructed:

> We review issues of contractual interpretation de novo. We are guided by well-settled principles and general rules of construction. "A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand* [*v. Pavletic*], 292 S.W.3d [618,] 630 [(Tenn. 2009)] (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). We initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are "contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citing *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011)). The literal meaning of the contract language controls if the language is clear and unambiguous. *Allmand*, 292 S.W.3d at 630. However, if the terms are ambiguous in that they are "susceptible to more than one reasonable interpretation," *Watson*, 195 S.W.3d at 611, we must apply other established rules of construction to aid in determining the contracting parties' intent. The meaning of the contract becomes a question of fact only if an ambiguity remains after we have applied the appropriate rules of construction.

*Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013).

"[A] party who commits the first uncured material breach of contract may not recover damages for the other party's material breach." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009). Therefore, Vastland Development asserts, Mr. Lublin could not recover for a breach of contract because he was the first to materially breach the contracts. We first address Vastland Development's argument regarding the contracts' lack of time-is-of-the-essence clauses. Vastland Development asserts that, even though there were no time-of-the-essence clauses in the contracts, other terms in the contracts made time of the essence for Mr. Lublin's obligations under the contract. Vastland Development bases its argument on language from the

decision of this Court in *Crye-Leike Realtors, Inc. v. Hay*, No. 02A01-9104CV00057, 1991 WL 192493 (Tenn. Ct. App. Oct. 1, 1991). Vastland Development asserts that this opinion created a general rule that "when the language of a real estate contract provides that a buyer's failure to perform by a certain date 'shall give the seller the right to declare the contract cancelled,' then time is of the essence for performance." We must respectfully disagree. *Crye-Leike* is best interpreted as reflecting the general proposition that time may be made of the essence by the "'subsequent conduct of the parties.'" *See Swilley v. Thomas*, No. E2022-01801-COA-R3-CV, 2024 WL 376760, at *6 (Tenn. Ct. App. Jan. 31, 2024) (quoting *Thompson v. Menefee*, 6 Tenn. App. 118, 128 (Tenn. Ct. App. 1927)). Indeed, in *Crye-Leike*, we agreed with the trial court's reasoning that "the parties to this contract made time of the essence" and found that "the language of the contract ma[de] the . . . closing date an essential term of the contract." 1991 WL 192493, at *3-4. The decision was based upon the specific conduct of the parties in the context of the contract's requirements.

Here, the parties' conduct in this matter does not support a finding that they understood time to be of the essence for any obligation, especially in light of the fact that the closing did not occur on the date specified in the contracts and no party sought to cancel the contract when that date passed with no closing occurring. *See, e.g.*, *Tatum v. Worsham*, No. 03A01-9507-CH-00219, 1996 WL 87453, at *2 (Tenn. Ct. App. Mar. 1, 1996) ("Given the fact that the parties continued to negotiate the sale after [the date for closing specified in the contract] and the fact that the contract did not state that the contract would terminate if the sale was not closed by that date, we . . . are unable to conclude that time was made of the essence by the parties in their contract or by their actions.").

Even assuming for argument's sake that time had been made of the essence in the absence of express provisions, it is unclear why this would mean that Mr. Lublin had committed the first material breach.[5] To start, the closing dates specified in the contracts cannot serve as the date by which Mr. Lublin was required to perform, because, as the trial court found, the closing dates served as placeholders, not certain closing dates, and, as addressed above, were not enforced by either party.[6] Therefore, Vastland Development cannot rely on this placeholder date and must instead put forward other obligations that

---

[5] Vastland Development also asserts that time was of the essence "because Mr. Lublin waived the requirements of notice and opportunity to cure" because, upon default, "the Seller may, without notice, sell the subject house and real estate to others." This argument is unavailing. The provision Vastland Development relies on concerns Vastland Development's options after Mr. Lublin is found to be in default. However, we do not conclude that Mr. Lublin was in default. Moreover, Vastland Development failed to identify how making time of the essence caused Mr. Lublin to violate the contracts.

[6] Vastland Development asserts that closing was scheduled for April 28 or 29, 2022; however, this assertion is based on Mr. Lublin's planned flights on those dates to conduct walkthroughs and its assertion that "there was no valid reason for the closings not to occur on those dates." From our review of the evidence, on April 21, 2022, Ms. Tippitt proposed these dates for "walks," but they were never definite closing dates. We must agree with the trial court that no closing was ever formally scheduled.

- 15 -

Mr. Lublin was required to comply with to be found to have breached the contracts. Vastland Development puts forward two of Mr. Lublin's obligations that it asserts he violated by not complying with the required timing provided for in the contracts.

First, Vastland Development asserts that Mr. Lublin "failed to close within five days of substantial completion, despite Vastland giving him multiple opportunities to do so." However, the contracts plainly state that the failure to close within five days of substantial completion was not a breach of the contracts. Rather, the remedy provided for was a $75-per-day increase in the purchase price, and the contracts defined "default" by Mr. Lublin as his failure to pay the full purchase price due at closing or to comply with any other term of the contracts. Mr. Lublin never failed to pay the increased cost due at closing because the properties never closed, meaning he did not fail to comply with this term of the contracts. Therefore, even for argument's sake, Mr. Lublin's failure to close within five days of substantial completion was not a default such that he committed the first material breach.

Second, Vastland Development asserts that Mr. Lublin "was undoubtedly in default of his obligations to provide proof of financing." The trial court concluded that "any potential technical violation of the financing timing was waived by Vastland Development based upon its failure to object to the issue within a reasonable time after the 21 days had lapsed." We agree. "A non-breaching party may . . . waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach." *Madden*, 315 S.W.3d at 813. Regarding waiver of contractual provisions, parties may waive "the right to enforce a provision in a contract," and "only immaterial part[s] of the agreed exchange may be waived." *GuestHouse Int'l., LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 201-02 (Tenn. Ct. App. 2009) (citation modified). Waiver must be proven by a preponderance of the evidence and "[g]enerally, whether a waiver of a contractual provision has occurred in a given factual setting is a question of fact." *Id.*

The requirement that Mr. Lublin provide proof of income was not a material term of the contracts or a right acquired by Vastland Development under the contracts, meaning that it was a term that may be waived. Vastland Development does not point to any evidence in the record to negate a finding of waiver or showing that it demanded proof of ability to perform. Indeed, in its appellate brief, Vastland Development states that, although it never sought to enforce this provision, "Mr. Lublin was unable at trial to identify evidence reflecting that he provided Vastland with any documentary evidence of his ability to perform the Contracts." Vastland Development drafted the contracts at issue and had full knowledge of their requirements and whether Mr. Lublin had provided such proof. Nevertheless, Vastland Development failed to require Mr. Lublin to comply with this term. Vastland Development's arguments on this issue are unavailing.[7]

---

[7] Vastland Development also challenges the trial court's finding that it acted in bad faith by failing to close on the contracts. We discern that Vastland Development is basing this argument on its assertion that

- 16 -

## B. Damages

Mr. Lublin sought damages arising from two sources: the variances between the terms of two financing offers he received and the lost rental income he asserts he would have received had the properties closed. The trial court found both of these claimed damages to be too speculative to support an award to Mr. Lublin. On appeal, he argues that he proved the existence and amount of these damages to a reasonable degree and that the court's decision was therefore an error.

In Tennessee, parties may recover "all damages that are the normal and foreseeable result of a breach of contract." *Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 14 (Tenn. Ct. App. 1985). When reviewing whether a party has sufficiently proven their claimed damages, "[w]e review the proof keeping in mind that uncertain, contingent, or speculative damages should not be awarded." *Id.* at 15. Speculative damages are only prohibited "when the existence of the damages is uncertain." *Id.* However, if only the amount of damages is speculative or impossible to prove with exactness, recovery will be allowed. *Id.* All that is required is that the party "lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages." *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 724 (Tenn. Ct. App. 2017). Indeed, "'the amount of future damages is necessarily "speculative and imprecise" to some degree.'" *Id.* (quoting *Rye v. Women's Care Ctr. Of Memphis, MPLLC*, 477 S.W.3d 235, 286 (Tenn. 2015)). "The amount of damages awarded is a question of fact and is, therefore, subject to review under the preponderance of the evidence standard." *Kirby v. Memphis Light Gas & Water*, No. W2017-02390-COA-R3-CV, 2019 WL 1895862, at \*2 (Tenn. Ct. App. Apr. 29, 2019).

---

it could void the contracts under the "reasonable cause" provisions. Vastland Development asserts that, in light of the totality of the circumstances, it did not act in bad faith by exercising this provision. Vastland Development attempts to support its arguments with five assertions that are either unsupported in the record or irrelevant to whether reasonable cause as provided for in the contract was established. Further, in the trial court, Vastland Development did not rely on the "totality of the circumstances" and instead asserted that increases in labor and material costs entitled it to void the contracts. Mr. McClung testified in support of these increases in cost; however, the trial court specifically addressed this testimony and found it not credible. We require clear and convincing evidence to overturn credibility-based findings. *See Easley*, 699 S.W.3d at 270. Vastland Development has not identified evidence meeting this standard.

Vastland Development also asserts that it was Mr. Lublin who acted in bad faith by delaying closing to obtain financing after his initial loan was denied. This argument fails because, even if we assume that Mr. Lublin did act in bad faith, which the trial court expressly found he did not, acting in bad faith is not a standalone claim, *see Jones v. BAC Home Loans Servicing, LC*, No. W2016-00717-COA-R3-CV, 2017 WL 2972218, at \*7 (Tenn. Ct. App. July 12, 2017) (noting that claims based upon the covenant of good faith and fair dealing are not stand-alone claims and do not provide independent bases for relief), and we have determined that time was not of the essence or that the timing requirements for his obligations were waived. As Vastland Development has not put forward a meritorious reason to support a finding that Mr. Lublin breached the contracts, this argument falls flat.

- 17 -

*i. Mortgage-related damages*

Mr. Lublin sought "mortgage-related damages" he allegedly suffered. He based these claimed damages on the differences between the terms of the two loans he was offered during the transaction, namely those from FirstBank and Volunteer State Bank. Specifically, Mr. Lublin sought the increased interest charges, origination fees, and required deposit amounts between the loan terms offered by FirstBank and Volunteer State Bank. In determining that the requested damages were too speculative to consider, the trial court concluded thusly:

> The Court finds the mortgage-related damages to be too speculative to consider. Although the Court finds Lublin's testimony to be credible as to these amounts, these numbers were simply negotiations and were never final. No testimony was provided to suggest otherwise. Lublin testified he was ready and willing to purchase the Properties with cash, at the time of contracting and at the date of the trial; thus, the Court will assume Lublin would have closed on the Properties via cash. Additionally, McClung testified he would be willing to close with cash. Thus, he is not entitled to these damages for interest rate increases, origination fees, or required deposits sought in connection with the mortgages.

Mr. Lublin asserts that this was an error as the "the trial court's assumption that Mr. Lublin would have closed in cash is unsupported by the evidence in the record" because, "while Mr. Lublin testified he was capable of closing these Units in cash if necessary, there was no evidence in the record permitting the Trial Court" to make this assumption. Mr. Lublin also asserts that, even if we agree with the court's "assumptions" regarding closing in cash, this does not support the trial court's finding that he was not financially harmed because, even if he had closed in cash, he testified that he would have immediately refinanced the properties. We disagree with Mr. Lublin's interpretation of the court's conclusion. We read the court's conclusion as being that Mr. Lublin's negotiations regarding financing with FirstBank never resulted in a binding loan commitment prior to Vastland Development sending the cancellation notice, and that, therefore, had Mr. Lublin been allowed to close at that time (i.e., without financing), he would have been able to close in cash and would, therefore, have had no mortgage-related damages.

To agree with Mr. Lublin would require this Court to overturn the trial court's finding that Mr. Lublin's dealings with FirstBank were "simply negotiations and were never final;" however, the evidence in the record does not preponderate against this finding. The only evidence, aside from Mr. Lublin's testimony, regarding the financing negotiations with FirstBank is an email from the banker at FirstBank to Mr. Lublin stating that the loan was "preliminarily approved" and requesting additional documents before the loan could receive final approval. The email reflects the trial court's understanding that the loan was never finalized and could have ultimately been denied just as the loan from Cross Country

was denied. Mr. Lublin does not direct this Court to any other documents showing that the loan progressed any further. Without a showing that Mr. Lublin actually had a loan and that he lost out on its more favorable terms, the existence of any damages cannot be said to be sufficiently proven. *See Tennison Bros.*, 556 S.W.3d at 725 (quoting *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004)) ("'The existence of damages has been proven with reasonable certainty when the mind of a prudently impartial person is satisfied that the injured party has been damages.'"). Therefore, we decline to overturn the court's conclusion.

In sum, without a binding loan commitment, Mr. Lublin did not prove that he suffered any mortgage-related damages because, without the initial commitment from FirstBank, there is nothing to compare to the subsequent offer from Volunteer State Bank, and whatever damages he suffered remained too speculative.

*ii. Lost rental income*

Mr. Lublin also challenges the trial court's decision not to award him damages resulting from the lost rental income he would have allegedly received had he been allowed to purchase the properties. Mr. Lublin sought $108,480 in damages based upon a monthly rental rate of $2,260 for 24 months, which constituted the full value of the lost rental income and not just the profit he would have expected to receive. The trial court found these numbers "to be inflated and too speculative for the entire 24-month period" because "these damages were determined under the unreasonable assumption that the properties could have immediately been rented upon closing and that a tenant would have continued to rent both properties throughout the 24-month duration." The court concluded that insufficient proof was offered to support the assertion that the properties could have been rented continuously at the testified to rate or regarding what the property taxes, insurance, or association fees would have been. This, therefore, created an "inflated amount of rental income." The court, however, found that, if it had awarded lost rental income, the rental rate would have been $1,950 per month for both properties, not $2,260.

The trial court's conclusion is essentially that, although Mr. Lublin testified regarding what rate he would have listed the properties at, he failed to provide sufficient evidence regarding what the net income would have been. Mr. Lublin asserts that he was not claiming damages from the breach but rather was seeking a monetary award incidental to the decree of specific performance, meaning he did not need to offer proof regarding what his income would have been. In other words, Mr. Lublin believes that his remedy was not limited to lost profits under this theory, he asserts, because the purpose of a monetary award after an "equitable accounting incidental to specific performance" is different than an award of damages in a breach of contract action. He asserts that the purpose of a monetary award incidental to a decree of specific performance is to compensate the party for the loss of use of the property and the deprivation of the property. Therefore, he asserts, parties are entitled to the full rental income and not just lost profits.

- 19 -

In support of this novel assertion, Mr. Lublin directs this Court to two cases that, he argues, contemplated monetary awards incidental to decrees of specific performance and did not "ever mention, discuss or equate the award of the fair rental value as lost profits." Neither case supports his assertions. In *Bush v. Cathey*, the trial court concluded that a real estate contract had been breached and awarded specific performance. 598 S.W.2d 777, 778 (Tenn. Ct. App. 1979). The court also awarded monetary damages for the fair rental value of the property. *Id.* The court then reduced the monetary damages amount based on the court's personal knowledge of costs related to home ownership. *Id.* at 782. On appeal, we affirmed the award of specific performance, but we reversed the trial court's decision to reduce the award of damages. *Id.* at 783. Although we determined that the plaintiffs were entitled to the fair rental value of the property "for the period in which they would have been in possession had the parties" complied with the contracts, we also cautioned that the plaintiff would not be entitled to the full rental value. *Id.* at 782-83. We then remanded the matter for a hearing on what the damages would have been. *Id.* at 783. Because the trial court had already found an appropriate rental value, it stands to reason that, if the plaintiff was entitled to this full amount as a result of the specific performance decree, no remand would be necessary, and the Court could have simply awarded the full amount by multiplying the rental rate by the number of months the plaintiffs were wrongfully deprived of possession. But remand was necessary, and this case does not provide support for Mr. Lublin's assertions.[8]

In his complaint, Mr. Lublin sought a "decree for specific performance and a judgment against [Vastland Development] for all other damages resulting from the breach of contract." Mr. Lublin was seeking damages from the breach of contract, which was a claim for compensatory damages. Compensatory damages are intended to "compensate a party for the loss or injury caused by a wrongdoer's conduct," and should "restore the injured party, as nearly as possible, to the position the party would have been in had the wrongful conduct not occurred." *Waggoner*, 159 S.W.3d at 57. Evidence supporting a claim for damages "need only prove the amount of damages with reasonable certainty," and the burden of proving damages falls on the party seeking them. *Id.*

Though he now attempts to argue otherwise, Mr. Lublin's damages claim was based on his lost profits. Lost profits damages may be based upon estimates. *Id.* at 58. However, "[a]n award for lost profits damages depends on whether the evidence provides a satisfactory basis for estimating what the injured party's probable earnings and expenses would have been had the wrongdoing not occurred." *Id.* at 58-59. This necessarily means that "damages for lost profits must be based on net profits, not on gross revenues or on

---

[8] The other case cited to by Mr. Lublin, *Smith v. Smith*, No. M2007-00511-COA-R3-CV, 2008 WL 490624 (Tenn. Ct. App. Feb. 21, 2008), also does not offer any support. That case similarly dealt with a trial court improperly reducing damages. *Smith*, 2008 WL 490624, at *5. However, in that case, the trial court had already accounted for "all proper credits, debits, and adjustments." *Id.* at *2. Therefore, awarding the full rental value simply awarded the remaining income. This case offers no support for Mr. Lublin's assertions.

gross profits." *Id.* at 59; *see also Am. Bldgs. Co. v. DBH Attachments, Inc.*, 676 S.W.2d 558, 562 (Tenn. Ct. App. 1984) ("It is also the rule in this state . . . that lost or expected profits are recoverable as damages."). Parties seeking to recover lost profits "must prove not only the probable income . . . but also the expenses they would have incurred to produce that income." *Waggoner*, 159 S.W.3d at 59 (discussing lost profits in the context of the sale of goods); *see also Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993) ("To determine the net profit over this period, if any, plaintiff's . . . other expenses required for the maintenance of the business must of course be deducted from the gross receipts."). Therefore, Mr. Lublin had the burden of proving what his expected profits from renting the properties were, and he failed to meet that burden.[9] Like the trial court, we conclude that the evidence submitted at the trial was too speculative to support an award of damages.[10]

Awarding Mr. Lublin the full value of the rental income he expected would put him in a better position than he would have been but for the breach and would, therefore, be inequitable. *See, e.g.*, *Lamons*, 909 S.W.2d at 801 ("The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position she would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of the contract than he would have been if the contract had been fully performed.").[11] Mr. Lublin's "balancing

---

[9] The existence of damages for one of the units is also questionable, as Mr. Lublin testified that he may have chosen not to rent one of the properties so that his family could stay there if they visit the area. This would necessarily negate some rental income as well.

[10] Mr. Lublin also challenges the trial court's conclusion that, based upon this Court's decision in *Bush v. Cathey*, 598 S.W.2d 777, 782 (Tenn. Ct. App. 1979), the court was required to "compensate [Vastland Development] for loss of use of the purchase money by awarding him the appropriate interest" and "must give credit for 'taxes, assessment, insurance premiums, repairs and the like.'" Based on our determination that Mr. Lublin failed to sufficiently prove what the profits from the rental income would have been, we find this issue pretermitted.

Mr. Lublin also asserts that the burden was on Vastland Development to prove any offsets and that, therefore, he did not bear the burden of showing what his income would have been. This argument is based on his assertion that he is not limited to lost profits as damages, which we have already discussed. The burden was on Mr. Lublin to provide a reasonable basis for the trial court to determine his damages, i.e., his net profits. Further, although Mr. Lublin asserts that only Vastland Development was aware of the expenses required for the property, this is not true. Evidence of expenses that would have been discretionary by Mr. Lublin was fully within his control to present at trial.

[11] None of the cases to which Mr. Lublin directs this Court support the proposition that he was entitled to the full rental value of the properties. For instance, Mr. Lublin cites the case of *Wiborg v. Eisenberg*, 671 So.2d 832 (Fla. Dist. Ct. App. 1996), for the proposition that an award of rental value is equitable compensation, thereby not limiting him to lost profits. While this case stated that the party did not have to plead the damages with specificity because, in Florida, these damages are incidental to an award of specific performance, the court also stated that "[d]amages awarded in specific performance are a way of compensation to adjust the equities between the parties to place them in a position that *they would have*

- 21 -

the equities" theory, purportedly entitling him to the full rental income and not just lost profits, is neither balanced nor equitable. Therefore, we find no merit in this novel assertion.

Finally, Mr. Lublin asserts that the trial court erred by failing to reopen the matter to hear additional evidence and to conduct an accounting to adjust the equities of the parties. We review a trial court's decision not to reopen proof under the abuse of discretion standard and will not set aside a court's decision absent a showing that it has caused an injustice to the party. *BOP, LLC v. Plastic Surgery of Nashville, P.C.*, No. M2019-00588-COA-R3-CV, 2020 WL 5991189, at *9 (Tenn. Ct. App. Oct. 8, 2020) (citing *Robinson v. LeCorps*, 83 S.W.3d 718, 725 (Tenn. 2002)).

The trial court determined that it was not appropriate to reopen proof when Vastland Development had already filed a notice of appeal. We find no basis to conclude this determination was an abuse of discretion. Parties "should not be permitted to reopen proof when there was ample time to gather such proof before the trial." *Runions v. Maury Cnty.*, No. M2006-00067-COA-R3-CV, 2007 WL 1062170, at *4 (Tenn. Ct. App. Apr. 9, 2007). It was within Mr. Lublin's means to determine what his actual net profits would have been, and we decline to overturn the trial court's decision not to reopen the proof.

## III. The TCPA

We turn next to whether Vastland Development violated the TCPA.[12] Vastland Development asserts numerous arguments regarding the TCPA claims. Analyzing these claims necessarily calls upon us to interpret and construe the TCPA, which we undertake according to the following familiar rules of statutory construction:

> "A court's primary aim 'is to carry out legislative intent without broadening or restricting the statute beyond its intended scope.' Courts presume that every word in a statute has meaning and purpose and that these words 'should be given full effect if the obvious intention of the General Assembly is not violated by so doing.' Words 'must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose.' When the meaning of a statute is clear, '[courts] apply the

---

*occupied had the contract been timely performed.*" *Wiborg*, 671 So.2d at 835. The position that Mr. Lublin would have occupied had the contract been timely performed was to have his lost profits, not the full rental value. The other cases cited by Mr. Lublin contain similar statements and therefore do not support his stated assertion. Therefore, we agree with the trial court that, whether as breach of contract damages or as an award incidental to a decree of specific performance, Mr. Lublin would not have been entitled to the full rental value for the period.

[12] It is undisputed that the TCPA applies to the claims and parties at issue in this matter.

plain meaning without complicating the task' and enforce the statute as written."

*SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 581 (Tenn. Ct. App. 2024) (quoting *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 159 (Tenn. 2021) (quoting *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013))).

As stated by this Court, "[t]he TCPA creates a private right of action for '[a]ny person who suffers an ascertainable loss of money or property . . . , or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part.'" *Id.* (quoting Tenn. Code Ann. § 47-18-109(a)(1)). Therefore, to establish a claim under the TCPA, plaintiffs must prove that "(1) 'another person,' i.e., the defendant, engaged in 'an unfair or deceptive act or practice described in § 47-18-104(b)' and (2) that the defendant's conduct caused an 'ascertainable loss of money or property." *Id.* (quoting § 47-18-901(a)(1)).[13] "[T]he TCPA is explicitly remedial, and Tennessee courts are

_____

[13] Vastland Development asserts that there must also be an independent finding that the conduct complained of was unfair or deceptive. While previous cases have analyzed whether the conduct complained of was unfair or deceptive, *see, e.g.*, *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 786 (Tenn. Ct. App. 2010), we believe this is no longer necessary based upon amendments to the statute that have occurred since these decisions. The statute previously stated:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1) (prior to 2011 amendment).

However, the statute has been amended to limit its scope to the list of prohibited conduct contained in Tenn. Code Ann. § 47-18-104(b), with the phrase "described in § 47-18-104(b)" having been added after "as a result of the use or employment by another person of an unfair or deceptive act or practice." *See* 2011 Tenn. Pub. Acts, c. 510 § 20 eff. October 1, 2011. Therefore, the statute now reads:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice *described in § 47-18-104(b) and* declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1) (additional language emphasized). At the same time, the legislature also amended Tenn. Code Ann. § 47-18-104(b) by deleting the words "Without limiting the scope of subsection (a), the" and substituting simply the word "The." *See* 2011 Tenn. Pub. Acts, c. 510 § 19 eff. October 1, 2011. Therefore, after these amendments, Tenn. Code Ann. § 47-18-104(a) continued to declare unlawful "unfair or deceptive acts or practices;" however, subsection (b) no longer contained language referencing subsection (a), and instead read: "The following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part."

- 23 -

therefore required to construe it liberally to protect consumers in Tennessee and elsewhere." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 47-18-115).

The "unfair or deceptive" act or practice at issue in the present matter is contained in Tenn. Code Ann. § 47-18-104(b)(14), which proscribes: "Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction."[14] Mr. Lublin was required to prove that Vastland Development caused confusion or misunderstanding with respect to the authority of Ms. Tippitt to negotiate the final terms of the transactions and that this caused an ascertainable loss of his money or property. *See* Tenn Code Ann. § 47-18-104(b)(14); *SmileDirectClub, Inc*, 708 S.W.3d at 581. Regarding these requirements, the trial court determined that Vastland Development had engaged in prohibited conduct, finding that:

> Vastland Development engaged in unfair and deceptive trade practices pursuant to Tenn. Code Ann. § 47-18-104(b)(14) which caused ascertainable loss to Lublin. First, both parties fall under the purview of the TCPA with Lublin being a consumer and Vastland Development being a professional seller of real estate. McClung testified at trial that Tippitt was an agent of Vastland Realty representing Vastland Development in the sale of these Properties; however, he testified she had no authority to close on a transaction nor to represent to Lublin, through Copeland, that Vastland

---

As we have previously stated, "[w]hen the legislature makes a change in the language of a statute, the general rule is that such change raises a presumption that the legislature intended a departure from the old law." *Dunn v. Hackett*, 833 S.W.2d 78, 81 (Tenn. Ct. App. 1992); *see also State v. Odom*, 928 S.W.2d 18, 30 (Tenn. 1996) ("When the legislature amends a statute, it presumably does so either to change the law or to clarify it."). These amendments, taken together, indicate that the legislature has amended the law so that conduct described in Tenn. Code Ann. § 47-18-104(b) is now the only conduct prohibited by the TCPA and courts need not inquire whether conduct is independently "unfair or deceptive." *Contra Fleming v. Murphy*, No. W2006-00701-COA-R3-CV, 2007 WL 2050930, at *6 (Tenn. Ct. App. July 19, 2007) (referring to Tenn. Code Ann. § 47-18-104(b) as merely "specific examples"). Indeed, the legislature has since amended Tenn. Code Ann. § 47-18-104(b) numerous times to expand the list of prohibited conduct, and the statute now declares 72 different acts unlawful versus the 48 it contained at the time of its amendment in 2011. This is not to say that there is no longer a general prohibition on deceptive conduct. To the contrary, there remains a subsection listing a general category encompassing "engaging in any other act or practice which is deceptive to the consumer;" however, this category may only be litigated by the attorney general. *See SecurAmerica Bus. Credit v. Schledwitz*, No. W2012-02605-COA-R3-CV, 2014 WL 1266121, at *23 n.16 (Tenn. Ct. App. Mar. 28, 2014) (citing Tenn. Code Ann. § 47-18-104(b)(27). Therefore, based upon the text of the statute, *see City of Hendersonville v. J&J Ventures, LLC, et al.*, No. M2025-00293-COA-R3-CV, 2026 WL 443684, at *7-10 (Tenn. Ct. App. Feb. 17, 2026) (discussing textualism), if the conduct complained of is proven to be conduct described in Tenn. Code Ann. § 47-18-104(b), it is by definition "unfair" or "deceptive," and no further inquiry is needed into the nature of the conduct.

[14] All references to the statute refer to the version in effect when Mr. Lublin filed his complaints in May 2022.

- 24 -

Development would continue with the closing after McClung allegedly terminated the Contracts by sending the Notifications. Contrary to this assertion, Copeland was told by Tippitt that Lublin could still close on the Properties even after the Notification forms had been sent. This is supported by text messages in the record between Copeland and Tippitt where Tippitt told Copeland to ignore the Notifications being sent and Lublin continuously asserted his intention to close the Properties.

The closing date provided in the Contracts was a placeholder, not a certain closing date. Thus, the time for the closing was up in the air to be negotiated upon completion of the Properties and was a required term that had to be set before the parties could proceed forward under the Contracts. All parties testified that Tippitt was an agent of Vastland Development and the primary point of contact for Lublin and Copeland throughout this entire process. The discrepancies in the communications with Tippitt and the Notification forms sent to Lublin created confusion regarding her authority, as the Realtor® for Vastland Development, to negotiate and close the terms of this consumer transaction. Thus, this conduct constitutes unfair and deceptive conduct in violation of the TCPA under subsection 14.

After our review, we must respectfully disagree that the evidence supported a finding of liability under the TCPA. The TCPA declares it unlawful to create confusion about the authority[15] of an agent to negotiate the final terms of a consumer transaction. *See* Tenn. Code Ann. § 47-18-104(b)(14). The trial court determined that Vastland

---

[15] We find it helpful to include a brief overview of the law of authority in agency law. We have previously described the relevant law thusly:

"An agent's actual authority to bind the principal consists of the powers which a principal directly confers upon an agent or causes or permits him to believe himself to possess. It flows from the manifestations of the principal to the agent." Actual authority can be classified into two categories: express and implied authority. An agent's actual "express authority is that which the principal gives to him in direct terms, either orally or written." An agent's actual implied authority "embraces all powers which are necessary to carry into effect the granted power, in order to make effectual the purposes of the agency."

Alternatively, apparent authority "is power held by the agent 'to affect a principal's legal relations with third parties when a third party reasonably believes the agent has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" The Tennessee Supreme Court has indicated that "[a]pparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency."

*Love v. McDowell*, No. E2022-00230-COA-R3-CV, 2022 WL 16646593, at *4 (Tenn. Ct. App. Nov. 3, 2022) (citations omitted).

- 25 -

Development caused confusion to Mr. Lublin as to Ms. Tippitt's authority through the discrepancies contained in Ms. Tippitt's text messages to Mr. Copeland and the cancellation notice. Vastland Development challenges the use of these texts, asserting that Ms. Tippitt's actions only created potential liability as to her own conduct.

Because the statute required a showing that Vastland Development caused confusion or misunderstanding regarding Ms. Tippitt's authority, Mr. Lublin must identify some action by Vastland Development that was misleading or inconsistent regarding her authority. However, we fail to find actions by Vastland Development that could lead to confusion regarding Ms. Tippitt's authority to negotiate the final terms of the transactions. To show that Vastland Development was inconsistent or misleading regarding Ms. Tippitt's authority, Mr. Lublin directs us to several provisions in the contracts where he asserts Ms. Tippitt was held out by Vastland Development as having "the exclusive authority" to represent it. As evidenced by Mr. McClung's testimony that Ms. Tippitt did not possess the authority to set the final closing dates, she did not have the exclusive authority to represent Vastland Development. These contractual provisions merely provide for Ms. Tippitt to serve as a point of contact, not the final arbiter of Vastland Development's commitments. For example, one provision Mr. Lublin cites provides that Ms. Tippitt was the point of contact for when Mr. Lublin wished to visit the property. The statute required that Vastland Development caused confusion or misunderstanding related to Ms. Tippitt's authority to negotiate the *final* terms of the transaction. To be sure, the evidence supports a finding that Vastland Development held Ms. Tippitt out as possessing the authority, in her role as a real estate agent, to help Vastland Development agree on a closing date with Mr. Lublin, presumably through Mr. Copeland. However, the evidence does not support a finding that Ms. Tippitt could reasonably have been understood to have possessed the authority to determine the final closing dates.

Furthermore, in Ms. Tippitt's messages to Mr. Copeland, she does not appear to speak on behalf of Vastland Development. Rather, she was speaking in her own capacity. A review of the two messages supports this conclusion. In the first message, Ms. Tippitt wrote that, "They are requiring that I send the cancellation form to you, but please ignore it until Bill decides about going the margin loan or cash route. Thank you." Later, she messaged Mr. Copeland, writing, "Brian, I was just required to send over the two notification/cancellation forms I mentioned last week to you. I did not send them to Bill, only to you. So sorry about all of this. I hope that Bill is able to close these!" From the context of the messages, it is clear that Ms. Tippitt was acting in her individual capacity. In the messages, she explicitly removed herself from supporting the notification forms, saying "they are requiring" and "I was just required." Then, she expressed her hope that Mr. Lublin could still close on the properties. "It is a well-known principle of the law of agency that . . . if the agent was acting entirely outside his principal's business and for some purpose of his own, it is not the act of the principal" absent adoption by the principal. *Jetton v. Polk*, 68 S.W.2d 127, 131 (Tenn. Ct. App. 1933). Ms. Tippitt's messages may support a finding that Mr. Lublin was confused about her actions or motivations; however,

they do not support a finding that Vastland Development caused confusion about her authority.

The TCPA claim must also fail because any wrongful conduct by Vastland Development did not proximately cause any losses he suffered. The statute provides that the loss must occur "as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b)." Tenn. Code Ann. § 47-18-109(a)(1). Our courts have interpreted this language to require plaintiffs "'show that [the defendant's] wrongful conduct proximately caused their injury.'" *Johnson v. Dattilo*, No. M2010-01967-COA-R3-CV, 2011 WL 2739643, at *7 (Tenn. Ct. App. July 14, 2011) (quoting *White v. Early*, 211 S.W.3d 723, 741 (Tenn. Ct. App. 2006)). Stated another way, there must be a "causative link between the" conduct and the loss. *Land v. Dixon*, No. E2004-01019-COA-R3-CV, 2005 WL 1618743, at *4 (Tenn. Ct. App. July 12, 2005). Therefore, the conduct deemed unlawful in Tenn. Code Ann. § 47-18-104(b)(14)—causing confusion or misunderstanding about Ms. Tippitt's authority—must bear a causal relationship to whatever loss Mr. Lublin suffered. Obviously, the purported cancellations caused Mr. Lublin to lose the properties until Vastland Development complied with the specific performance decree. However, it is his confusion over Ms. Tippitt's authority that must have caused the loss of the properties. Whatever confusion Mr. Lublin suffered did not cause him to lose the properties at issue.

For all of the foregoing reasons the trial court, as to its TCPA finding, is reversed.

IV. Attorney's fees

The only remaining issues are related to attorney's fees. As previously stated by this Court:

> In Tennessee, we have "long followed the 'American Rule' with regard to attorney's fees." Under the American Rule, "a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case." When an agreement exists between parties that entitles the prevailing party to recover attorney's fees, "[o]ur courts long have observed at the trial court level that parties are contractually entitled to recover their reasonable attorney's fees . . . ." Our Supreme Court has stated that this observation is also true at the appellate court level and explained its reasoning as follows:
>
>> Absent fraud, mistake, or some other defect, our courts are required to interpret contracts as written, giving the language used a natural meaning. This axiomatic rule does not change or lose its force because the parties to an agreement are before an

appellate court. Indeed, one of the bedrocks of Tennessee law is that our courts are without power to make another and different contract from the one executed by the parties themselves.

*Tennessee Homes v. Welch*, 664 S.W.3d 1, 21 (Tenn. Ct. App. 2022) (quoting *Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017) (further citations omitted).

We begin with the trial court's award of attorney's fees and costs to Mr. Lublin pursuant to the TCPA. *See* Tenn. Code Ann. § 47-18-109(e)(1) (providing for an award of attorney's fees and costs "upon a finding by the court that a provision of this part has been violated."). Because of our decision to reverse the trial court's TCPA determination, we necessarily also reverse the court's award of his attorney's fees, as there is no longer a basis upon which Mr. Lublin may be awarded his attorney's fees. *See id.* Mr. Lublin also seeks his attorney's fees incurred on appeal under the TCPA, which, for the same reason, is denied.

Vastland Development requests its attorney's fees pursuant to the contracts, which provided:

> In the event of a dispute between the parties arising out of or related to this Agreement, if Seller should prevail in dispute, Seller shall be entitled to recover all of its costs and expenses, including but not limited to, its reasonable attorney's fees incurred in connection with the dispute, whether Seller incurs such costs, expenses and fees before, during or after the institution of a lawsuit or other dispute resolution proceeding.

Vastland Development asserts that the trial court erred by failing to award it its reasonable attorney's fees and costs and, additionally, seeks an award of fees and costs in this Court. Per the language of the contracts, should litigation arise from, or be related to, the agreements, if Vastland Development is the prevailing party, courts must award it all of its attorney's fees and costs. Therefore, we are called upon to determine whether Vastland Development prevailed in both courts. The contracts do not define "prevailing party." However, our Supreme Court has adopted the understanding of "prevailing party" as requiring a "judicially sanctioned change in the legal relationship of the parties." *See Colley v. Colley*, 715 S.W.3d 293, 317 (Tenn. 2025) (Campbell, J., concurring in part and concurring in the judgment) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 605 (2001)); *see also Fannon v. City of LaFollette*, 329 S.W.3d 418, 430-32 (Tenn. 2010). "This type of 'judicially sanctioned' relief most often comes in the form of 'enforceable judgments on the merits and court-ordered consent decrees.'" *Fannon*, 329 S.W.3d at 431 (quoting *Buckhannon*, 532 U.S. at 604-05). Complete success is not required, but "a prevailing party is one who has succeeded 'on any

significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433(1983)).

With this understanding, it becomes clear that Vastland Development was not the prevailing party in the trial court. Mr. Lublin filed suit seeking possession of the homes. After trial and after review in this Court, he has achieved this result. *See Colley*, 715 S.W.3d at 304 (concluding that a party had prevailed because she achieved her desired result). At the same time, Vastland Development has successfully rebuffed Mr. Lublin's TCPA claim, thereby achieving some success as well. Therefore, both parties have partially succeeded such that neither can be found to be the prevailing party. *See Wright v. Wright*, No. M2024-01746-COA-R3-CV, 2026 WL 706775, at *8-9 (Tenn. Ct. App. Mar. 13, 2026) (finding that, because both parties achieved partial success, there was no prevailing party for awarding attorney's fees). On the central issue of the case, whether Vastland Development breached the contracts, it has not prevailed. Therefore, we do not disturb the trial court's decision not to award Vastland Development its fees and costs from the trial. Nor do we find Vastland Development to be the prevailing party in this Court. Therefore, we do not award it its fees and costs incurred on appeal.

CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part. Costs of this appeal are assessed against the appellant, Vastland Northcrest Development, LLC, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE